**UNITED STATES of America, Plaintiff-Appellee,**

v.

**John B. CALANDRELLA, Defendant-Appellant.**

**UNITED STATES of America, Plaintiff-Appellee,**

v.

**John A. KAYE, Defendant-Appellant.**

**Nos. 78–5341, 78–5342.**

United States Court of Appeals, Sixth Circuit.

Submitted April 19, 1979.

Decided Aug. 31, 1979.

Kenny Grantz, M. Stephen Pitt, Tarrant, Combs & Bullitt, Louisville, Ky., for defendant-appellant in No. 78–5342.

Albert Jones, U. S. Atty., James H. Barr, Asst. U. S. Atty., Louisville, Ky., Andrew S. Gordon, c/o T. George Gilinsky, Washington, D. C., for plaintiff-appellee.

Before WEICK and CELEBREZZE, Circuit Judges and PECK, Senior Circuit Judge.

WEICK, Circuit Judge.

The defendants-appellants have filed separate appeals from judgments of conviction entered upon guilty verdicts of the jury in a joint trial on a three count superseding indictment. The indictment charged the defendants and five other co-defendants with conspiracy (18 U.S.C. § 371) to violate §§ 1014, 2314, 1341 and 1343 of 18 U.S.C. (Count 1) and with the substantive offenses of making or causing to be made materially false statements and reports in an application for a loan from a FDIC bank (18 U.S.C. § 1014) and aiding and abetting in the commission thereof (18 U.S.C. § 2) (Count 2), and fraud by wire (18 U.S.C. § 1343) and aiding and abetting in the commission thereof. (18 U.S.C. § 2) (Count 3).

The co-defendants, Carl Thomas Bannon, Jr. and Phillip Karl Kitzer, Jr., pleaded guilty and testified for the government at the trial. Co-defendants John Derek Packman, Pascal Cornaz and Jean-Claude Cornaz resided in foreign countries and were not extradited and did not attend the trial.

The two convicted defendants were each sentenced to consecutive terms of five years imprisonment on counts 1 and 3 and to concurrent terms of two years imprisonment on count 2, for a total sentence of 10 years each. The appeals were heard together.

In these appeals, in briefs, making virtually the same contentions, the appellants have argued a number of issues relating to the various phases of the case. Finding each of these claims ultimately to be with-

Paul J. Redmond, (court appointed—CJA) Lincoln, Mass., for defendant-appellant in No. 78–5341.

out merit, we affirm the judgments of conviction.

## I. Facts

This case involves a simple fraud perpetrated with the aid of an international conspiracy. The cast of characters includes several persons in addition to the appellants herein. One key figure is co-defendant Phillip Karl Kitzer, who testified as a government witness. During the period covered by the indictment, he was in the business of taking over or forming various financial institutions ("vehicles") in different countries and having them issue overvalued certificates of deposit (CD's) and other financial instruments. For a fee, generally 10% of the face amount of the CD, Kitzer would provide a certificate to a "desperate" businessman who was having difficulty obtaining legitimate financing. Kitzer's CD's were at no time backed by sufficient funds to cover their face value. Because these instruments could not withstand close scrutiny by banking officials, purchasers were instructed that the CD's should only be used to improve a corporate balance sheet, and should not be pledged as collateral for a loan. If they were used as instructed, it was hoped that a bank considering a loan application would not bother to investigate the CD or its issuer too closely, since they were shown only on the books of the borrower.

Although Kitzer never expected to receive funds to pay the face amount of the certificates, he generally obtained a post-dated check from the certificate purchaser in addition to his 10% fee. This check would be written in an amount equal to the face amount of the CD purchased and would be postdated to the CD's maturity date. In this way, Kitzer felt protected if a holder ever demanded payment on the certificate.

At times relevant to this case, Kitzer was using his Seven Oak Finance Limited (Seven Oak), a financial institution of Kent, England, as his "vehicle" for issuing certificates of deposit. Unknown to Kitzer, however, two undercover FBI agents had infiltrated his organization. From February, 1977, until October, 1977, agents Brennan and Wedick were Kitzer's daily companions, serving as trusted apprentices in the enterprise.

In the typical transaction involving Seven Oak CD's, the "desperate" businessman would be placed in contact with Kitzer through a financial broker. Co-defendant Carl Thomas Bannon, who also testified as a government witness, was such an individual. For a fee he would attempt to secure funds from persons looking for investments for others looking for loans. Generally, he would attempt to arrange to have the chosen investor deposit funds in a selected commercial bank as a compensating balance to secure a bank loan to Bannon's fee-paying client. Bannon and the investor would then split the fee, and in addition, the investor would earn the applicable rate of interest on his deposited funds.

Defendant Kaye became a client of Bannon's in 1975. At that time, they were able to complete one such deal. Thereafter, and until Bannon entered prison on unrelated charges in January 1977, the two men were unsuccessful in their efforts to close other similar deals.

Kaye operated several enterprises, the principal one being Globe Natural Gas Company. Although Kaye was nominally only a "consultant" to Globe, it was plain that he not only controlled but actually ran the company. Over the period of his relationship with Bannon, Kaye had attempted to purchase several mineral properties. The deals could not be closed, however, because Kaye had been unable to arrange financing for the acquisitions. Several banks had refused to make loans to Kaye or to Globe, despite assurances from Bannon.

In December 1976, Bannon met Kitzer and was instructed on Kitzer's method of using Seven Oak CD's to improve the chances of obtaining a conventional bank loan. Kitzer also told Bannon that the CD's should not be used for collateral. Because of the repeated disappointments which Bannon had experienced in his attempts to help Kaye, and because Bannon was anxious to close a deal before he had to report to

prison, he fully explained Kitzer's methods to Kaye. Bannon also told Kaye of Kitzer's restrictions on the use of the CD's.

With all of this knowledge, Kaye purchased a $100,000 Seven Oak CD on December 17, 1976. He sent Bannon two checks totalling $100,000, postdated to the maturity date of the CD. He also sent $11,000 to cover Kitzer's and Bannon's fees.

During the week following Christmas, 1976, Bannon learned that his earlier conviction had been affirmed and that he would have to report to prison. Pursuant to an earlier arrangement, defendant Calandrella was to take over the operation of Bannon's financial brokerage business, Bannon International. Calandrella was also in the brokerage business, and Bannon was impressed with his abilities. Since the well-being of Bannon's family depended on Calandrella's ability to run Bannon's business, Bannon explained as much as he could about the operation, including the details of the dealings with Kaye and with Kitzer. Bannon remained in contact with Calandrella while the former was in prison.

Armed with the Seven Oak CD, Kaye renewed his efforts to close various deals for the purchase of mineral property. Apparently ignoring Bannon's specific instructions, Kaye began offering to pledge the Seven Oak CD's as collateral. One bank that investigated the matter informed Kaye in March 1977 that the CD was worthless. Undaunted, Kaye attempted to negotiate another deal, which also collapsed.

Finally, Kaye attempted to close yet one more deal for the purchase of coal property, this time involving the Louisville Trust Bank. On March 31, 1977, Kaye met for the first time with officials of the bank, and attempted to negotiate a $4.5 million dollar loan. At that time he presented the CD, a balance sheet for Globe, and a letter of introduction prepared by Calandrella acting for Bannon International. The letter explained that Seven Oak was committed to the issuance of up to $9 million in CD's on behalf of Globe and represented that the Union Bank of Switzerland, a well known institution, would guarantee all of the CD's including the one already issued. Kaye also at some point displayed a copy of an accountant's opinion letter concerning Globe that was purportedly prepared by one, Linden Headlee.

Unfortunately, for Kaye, evidence at trial showed that, even aside from the problems with the Seven Oak CD, the documents offered by Kaye either contained false statements or were fraudulent in their entirety. For example, a representative of the Swiss bank testified that the bank would not as a matter of policy guarantee CD's issued by another financial institution. Linden Headlee, the accountant, denied preparing the opinion letter submitted by Kaye, although he stated that he had done work for Kaye at an earlier time. Also, another accountant testified that a $20 million asset on the Globe balance sheet was overvalued under accepted accounting procedures.

Even before Kaye's arrival at the Louisville Trust Bank, certain bank officials had been warned that a man named Kaye might attempt to use a CD of questionable value to obtain a loan. The officials were instructed, however, to treat the transaction in a normal fashion. Indeed, a bank officer stated at trial that had their investigations proved favorable, they would have granted Kaye a loan despite the warning. Accordingly, the bank attempted to verify the validity of the CD and the integrity of its issuer. They encountered difficulty, however, in contacting either Bannon International or Seven Oak. Kaye then assisted by placing a telephone call to Calandrella and giving the receiver to bank vice president Hagan. Calandrella spoke to Hagan, repeating the assurances contained in his letter of introduction, and offering to assist in contacting Seven Oak directly. Calandrella again confirmed the validity of the CD and Kaye's right to use it in a later mailgram. Thereafter, the Louisville Trust Bank received a telex from Seven Oak assuring the bank of. Kaye's right to use the CD as "backup collateral." Hagan sent a responding telex to Seven Oak, asking who was authorized to bind the institution. A

second telex from Seven Oak stated that one John Packman, who sent the first telex, was an authorized agent.

The evidence at trial also showed that in addition to helping Kaye, Calandrella was actively pursuing several other similar deals involving Seven Oak CD's. In this connection, he met Kitzer on several occasions in various European and American cities. They discussed pending deals, including the problem of obtaining the promised Swiss bank guarantees for Kaye's CD's.

Kaye was arrested on April 11, 1977, on the premises of the Louisville Trust Bank pursuant to an arrest warrant. When he was arrested, the FBI agents seized the briefcase that he was carrying. Both Kaye and the briefcase were taken to the local FBI office, where the case was opened and searched without a warrant and without Kaye's consent. The briefcase was found to contain several versions of a Globe Natural Gas balance sheet. In all, 28 documents found in the briefcase were introduced at trial.

## II. The Arrest

The defendants maintain that the arrest warrant was invalid because the complaint on which it was issued did not contain facts sufficient to establish the existence of probable cause. Viewing the evidence obtained from the subsequent search of Kaye's briefcase as a fruit of that arrest, the defendants contend that the evidence should have been suppressed.[1]

 As regards defendant Calandrella, the government submits that irrespective of the merits of this argument, he is not entitled to relief because he was not the victim of any fourth amendment violation. We agree. Fourth amendment rights ·are personal and may not be asserted vicariously. *Alderman v. United States,* 394 U.S. 165, 171–74, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). As the Supreme Court recently stated in *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 425, 58 L.Ed.2d 387 (1978):

A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed. *Alderman, supra,* 394 U.S., at 174, 89 S.Ct., at 966. And since the exclusionary rule is an attempt to effectuate the guaranties of the Fourth Amendment, *United States v. Calandra,* 414 U.S. 338, 347, 94 S.Ct. 613, 619, 38 L.Ed.2d 561 (1974), it is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the rule's protections.

Not being the victim of the allegedly illegal arrest, and not having any personal proprietary interest in the briefcase or its contents, Calandrella is simply not entitled to complain about the arrest or the admissibility as against him of any of the evidence seized thereby. *See Rakas, supra; United States v. Killebrew,* 594 F.2d 1103, 1105 (6th Cir. 1979).

As regards Kaye, the government contends that the complaint, when read as a whole, was sufficient to establish probable cause for the arrest. The basic requirements for the issuance of a federal arrest warrant upon a complaint are contained in Fed.R.Crim.P. 3, 4, which provide in pertinent part:

Rule 3. The Complaint

The complaint is a written statement of the essential facts constituting the offense charged. It shall be made upon oath before a magistrate.

Rule 4. Arrest Warrant or Summons upon Complaint

(a) Issuance. If it appears from the complaint, or from an affidavit or affidavits filed with the complaint, that there is probable cause to believe that an offense has been committed and that the defendant has committed it, a warrant for the arrest of the defendant shall issue to any officer authorized by law to execute it. Upon the request of the attorney for the government a summons instead of a war-

---

1. The motion to suppress was originally only filed on behalf of Kaye. During the trial, how-

ever, the District Court permitted Calandrella to join in the motion.

rant shall issue. More than one warrant or summons may issue on the same complaint. If a defendant fails to appear in response to the summons, a warrant shall issue.

(b) Probable cause. The finding of probable cause may be based upon hearsay evidence in whole or in part.

■ In *Giordenello v. United States*, 357 U.S. 480, 485–86, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958), the court explained that these requirements implement the mandate of the warrant clause of the fourth amendment. *See Aguilar v. Texas*, 378 U.S. 108, 112 n. 3, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). The basic requisite is that a judicial officer be supplied with information sufficient to enable him to make an independent judgment that probable cause exists. *Whiteley v. Warden*, 401 U.S. 560, 564, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971); *United States v. Evans*, 574 F.2d 352 (6th Cir. 1978). To support the issuance of a warrant, the facts, including credited hearsay statements, must show something more than a suspicion of criminal activity, but need not be sufficient to support a conviction. *Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); *see Jaben v. United States*, 381 U.S. 214, 224–25, 85 S.Ct. 1365, 14 L.Ed.2d 345 (1965); *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). And in considering the complaint (together with any affidavits) the magistrate must not engage in a hypertechnical reading. Instead, he must employ a common sense approach. *See United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965).

■ Because of the preference for the use of warrants by law enforcement officers, and also because of the harshness of the remedy of suppression, which is employed where violations are found, we have held in the context of a search warrant that on review, the magistrate's determination will be afforded great deference even in doubtful cases; his judgment will be upheld unless it was "arbitrarily exercised." *E..g., United States v. Lee*, 581 F.2d 1173, 1177 (6th Cir. 1978); *United States v. Swihart*, 554 F.2d 264, 270 (6th Cir. 1977); *United States v. Giacalone*, 541 F.2d 508, 513–14 (6th Cir. 1976) (en banc). Thus even where alternative readings of an affidavit or a complaint are equally susceptible, we will not disturb the magistrate's choice of one reading over the other. *United States v. Hatfield*, 599 F.2d 759 at 762 (6th Cir. 1979); *United States v. Giacalone, supra*, 541 F.2d at 516.

■ Inasmuch as we believe that the same policies apply with similar force in the context of an arrest warrant as they do in the context of a search warrant, we apply the same standards of review here. *Cf. Whiteley v. Warden, supra*, 401 U.S. at 564, 91 S.Ct. 1031; *Aguilar v. Texas, supra*, 378 U.S. at 112 n. 3, 84 S.Ct. 1509 (cases state that the fourth amendment's probable cause requirement applies in a like fashion both to arrest warrants and to search warrants).

■ In reviewing the complaint in this case, which is set out in the margin,[2] we

2. The complaint reads as follows:
 Before Dale R. Booth, Louisville, Kentucky. The undersigned complaint being duly sworn states:
 That on or about March 31, 1977, at Louisville Kentucky in the Western District of Kentucky[1] John A. Kaye did[2] knowingly make false statements and reports and pledged worthless overvalued securities for the purpose of influencing the loan action of an institution whose accounts are insured by the Federal Deposit Insurance Corporation. And the complainant states that this complaint is based on information furnished in a communication from the Charlotte Office of the Federal Bureau of Investigation (FBI)

that Stuart A. Allen, Security and Exchange Commission, Washington, D.C., had received information that certificates of deposit drawn against Seven Oaks Finance Limited, London, England, were flooding the entire country. Allen advised a $100,000 certificate of deposit from Seven Oaks would be deposited into an unknown Louisville, Kentucky, bank by a man known as Kaye. Allen advised he had arranged for the Kentucky State Police to arrest John A. Kaye on fraud charges. On information from William H. Hagan, Vice President, Louisville, Trust Bank, that he received a certificate of deposit from John A. Kaye, drawn on Seven Oak Finance Limited, Kent, England, number 2004, dated Decem-

believe that sufficient facts were presented to enable us to conclude that the magistrate's determination was not arbitrary.

The essence of the violation charged was stated in the opening paragraph as follows:

> That on or about March 31, 1977, at Louisville, Kentucky in the Western District of Kentucky John A. Kaye did knowingly make false statements and reports and pledged worthless overvalued securities for the purpose of influencing the loan action of an institution whose accounts are insured by the Federal Deposit Insurance Corporation.

This conclusion is sufficiently supported, we believe, by the sum of the following facts: First, bank vice president Hagan had stated that defendant Kaye had presented a $100,000 Seven Oak certificate of deposit in an effort to obtain a loan. Hagan further stated that Kaye had supplied a letter from defendant Calandrella, which introduced Kaye, and which promised that $9 million in CD's would be forthcoming together with an endorsement and guarantee from the

Union Bank of Switzerland. Hagan also stated that he had been unable to verify the validity of the certificate through normal channels.

Second, the complaint indicated that "contact" had been made with an Alfus R. Bomgardner (*sic* Baumgartner) of the First National Plaza Bank. He "disclosed" that the Union Bank of Switzerland does not and would not endorse or guarantee certificates of deposit.

Third, the complainant stated that Detective Inspector Guilbert of New Scotland Yard had provided information to the effect that British officials had informed Seven Oak officers that an investigation was underway and that the government would seek a "compulsory wind up" of the company, terminating its operations.

Fourth, the complaint stated that another FBI office had provided information that one Stuart Allen of the SEC had himself received information indicating that Seven Oak CD's were "flooding" the country. Al-

ber 17, 1976, issued to Globe Natural Gas Company, Incorporated, in the amount of $100,000. He also received from Kaye a letter of introduction from John B. Calandrella introducing John Kaye and stating certificates of deposit in the amount of nine million dollars would be forthcoming with endorsement and guarantee from Union Bank of Switzerland. Hagan was also furnished a financial balance sheet for Glove Natural Gas. Hagan stated attempts to verify the validity of the certificates of deposit through normal banking channels met with negative results. Contact with Alfus R. Bomgardner, First National Plaza Bank, New York, New York, disclosed Union Bank of Switzerland does not guarantee nor endorse certificates of deposit, they never have and they never will. Information received from Detective Inspector Ken Guilbert, Company Fraud Department, New Scotland Yard, advised the directors of Seven Oak Finance Limited have been informed by the British Department of Trade that an investigation has been conducted and a compulsory wind-up order to have them cease business will be applied for. On information furnished from FBI, Boston, that Karl Thomas Brannon, Jr., President, Brannon International, Boston, Massachusetts, is presently incarcerated in the Federal Penitentiary, Allenwood, Pennsylvania, for illegal securities dealings. On information furnished by FBI, Cincinnati, that Robert Kay (*sic*), son of John Kay (*sic*), is currently president of

Globe Natural Gas, that John Kay (*sic*) is a consultant for Globe Natural Gas, that they are in receipt of confidential information stating Globe Natural Gas has had during the past six months a steady stream of private investors lodging complaints regarding investments, dividends and no returns, that Kaye has been in and out of bankruptcy for the past 14 or 15 years, and that Kaye was sentenced to two years in the Federal Penitentiary for stock and security fraud. On information furnished by FBI, Boston, that in February 1977, Kaye representing Globe Natural Gas Company of Ohio, attempted at a bank in Virginia to secure a two million dollar loan with Seven Oak certificates.

And the complainant further states that he believes that Special Agent William S. Cheek, Jr., FBI, Louisville, Kentucky, William H. Hagan, Vice President, Louisville Trust Bank, Representatives of FBI Charlotte, North Carolina, Boston, Massachusetts and Cincinnati, Ohio are material witnesses in relation to this charge.

> (s) William S. Cheek, Jr.
> Complainant
> Special Agent, FBI

Sworn to before me, and subscribed in my presence April 11, 1977.

> (s) Dale R. Booth
> United States Magistrate

len advised that a man known as Kaye would attempt to deposit a $100,000 CD at an unknown Louisville bank. Finally, Allen had reportedly "arranged" for local authorities to arrest Kaye on fraud charges. The complaint does not indicate how Allen knew the facts which he supplied to the FBI.

Although the complaint contains other statements, some of which are either irrelevant or not shown to be reliable, we believe that the above information met the requirement of showing that there was a "probability" that Kaye was using worthless, overvalued CD's and was making false statements concerning those CD's in order to obtain a loan from the Louisville Trust Bank, in violation of 18 U.S.C. § 1014. *See generally Brinegar, supra,* 338 U.S. at 175–76, 69 S.Ct. 1302; *United States v. Prince,* 548 F.2d 164, 165 (1977).

■ With regard to the information supplied by Hagan, Kaye complains that the facts on their face are innocent, that the CD is not specifically alleged to be worthless, and that the complaint does not explain who Calandrella is. The short answer is that Hagan was simply reporting the results of his personal encounter with Kaye as well as his bank's attempt to verify certain information through normal channels. There is no requirement that each fact contained in a complaint itself show the existence of criminal activity, only that the sum total of all the facts establish probable cause. *See United States v. Prince, supra,* 548 F.2d at 166, quoting *Smith v. United States,* 123 U.S.App.D.C. 202, 206, 358 F.2d 833, 837 (D.C.Cir. 1966), *cert. denied,* 380 U.S. 1008, 87 S.Ct. 1350, 18 L.Ed.2d 448 (1969).

■ With regard to the hearsay statements attributed to Mr. Baumgartner, Kaye's primary complaint is that there is no showing of Baumgartner's reliability or that Kaye knew of the fact that the Swiss bank would not issue endorsements or guarantees. In this context, he urges application of the tests announced in *Aguilar v. Texas, supra,* for crediting hearsay allegations of criminal activity attributed to unnamed professional informers. In contrast, this case involves statements attributed to a named banking official who was not a professional informer. The information was facially neutral, and merely concerned the customary banking practices of a specific institution. While it would have been preferable for the complaint to provide more detail or other indicia of the reliability of this information, we believe that these statements could properly be credited by the magistrate. *See United States v. Swihart,* 554 F.2d 264, 268–69 (1977).

■ Concerning the information supplied by agents of New Scotland Yard, Kaye submits that the complaint does not state how the information was gathered. He also argues that the facts disclosed failed to show necessarily that there was any wrongdoing or that Kaye knew of any problems with the CD's. First, we believe that the magistrate was fully entitled to rely on simple objective facts supplied by other law enforcement officers. *See United States v. Ventresca,* 380 U.S. 102, 109–11, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *United States v. Jenkins,* 525 F.2d 819, 822 n. 3 (6th Cir. 1975) (per curiam).

Second, as to the contention that the facts supplied by Scotland Yard did not establish any wrongdoing, we note again that there need only be a probability that Kaye was knowingly using worthless overvalued securities and making false statements. Certainly if the Seven Oak directors had been informed that proceedings were going to be instituted to require the termination of their operations, then it was also likely that there was a serious question as to the continuing value of their certificates of deposit. It was also doubtful that they would be able to issue or honor many future CD's.

■ Third, as to the contention that there was no showing that Kaye possessed the requisite knowledge concerning the falseness of some of his representations, or concerning the likely infirmities with the Seven Oak CD's, we believe this borders on being ridiculous. The magistrate could properly rely on the existence of a pattern

of false and unverifiable representations to show that it was at least reasonably probable that Kaye did in fact have knowledge of these falsities and infirmities. *See generally United States v. Giacalone*, 541 F.2d 508, 516 (6th Cir. 1976) (en banc).

Finally, as regards the hearsay statements attributed to Stuart Allen of the SEC, Kay submits that the complaint does not disclose the source of Allen's information or any other reason to credit his statements. Kaye notes that Allen did not contend that the Seven Oak CD's were illegal or overvalued, and he further maintains that Allen's bald assertion that Kaye would be arrested by state officers cannot provide probable cause for the federal arrest.

We believe that the magistrate was entitled to give some credit to the statement of objective fact that large numbers of Seven Oak CD's were entering the country. Although the precise source of this information was not disclosed, the information was reported by federal officers from the agency charged with the oversight of securities transactions. Also, certain of his information (to the effect that a man named Kaye would attempt to utilize a $100,000 Seven Oak CD at a Louisville bank) had already proven to be correct. *See Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). The danger of Allen having falsified his information is simply not as great as with an unnamed criminal informer who may be seeking favorable treatment from the government or revenge against the suspect. *Jaben v. United States, supra*, 381 U.S. at 224, 85 S.Ct. 1365, 14 L.Ed.2d 345; *see United States v. Ventresca, supra*, 380 U.S. at 111, 85 S.Ct. 741, 13 L.Ed.2d 684.[3]

Considering the sum of the facts alleged in the complaint, we are of the opinion that the magistrate did not act in an arbitrary manner in issuing the arrest warrant for Kaye.

As an alternative justification for the arrest, the government contends that irrespective of the validity of the arrest warrant, the collective knowledge of the FBI agents at the time of the arrest was sufficient to establish probable cause. We agree with this alternative argument.

It is established that a warrant is not required to effect a public arrest so long as the officers possess probable cause. *United States v. Watson*, 423 U.S. 411, 414–24, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); 18 U.S.C. § 3052. Thus, even where an arrest warrant is found to be defective, the simple existence of probable cause will support the officer's action. *See Whiteley v. Warden, supra*, 401 U.S. at 568–69, 91 S.Ct. 1031; *Henry v. United States*, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959); *United States v. Fachini*, 466 F.2d 53, 56–57 (6th Cir. 1972). Also, this court has previously held that probable cause may be established from the collective knowledge of the arresting officers. *E. g., United States v. Killebrew, supra*, 594 F.2d at 1105; *United States v. McManus*, 560 F.2d 747, 750–51 (6th Cir. 1977), *cert. denied*, 434 U.S. 1047, 98 S.Ct. 894, 54 L.Ed.2d 798 (1978).

Although there was no hearing on the defendants' motion to suppress, the testimony at trial included the following: FBI agent Wilson, who was present at Kaye's arrest, testified that he was the "case agent," and that agents Brennan and Wedick, working undercover, had become confidants and "partners" of Kitzer, the owner of Seven Oak. Prior to Kaye's arrest, their reports had indicated that Seven Oak had issued a number of overvalued certificates of deposit and letters of credit. Agents Brennan and Wedick also testified. Elaborating on Agent Wilson's testimony, they explained that they were in daily contact with Kitzer beginning in February 1977. They secretly prepared daily reports which

---

3. Kaye has also contended that the complaint was fatally defective because it failed to allege that the Louisville Trust Bank was insured by the FDIC. We believe that this contention is totally without merit and is fully answered by *United States v. Sevier*, 539 F.2d 599 (6th Cir. 1976), where this court held that it was not a fatal omission for an affidavit in support of a search warrant to fail to state that the weapons sought had traveled in interstate commerce, as is required to establish a violation of 18 U.S.C. App. § 1202(a).

indicated that Kitzer provided overvalued CD's to desperate individuals who could not obtain legitimate financing.

When this information is added to that already contained in the complaint, we believe that it is plain that the arresting officers' collective information was sufficient at the time of the arrest to warrant the belief that it was probable that Kaye was knowingly presenting overvalued or worthless CD's and was making false representations in order to influence the Louisville Trust Bank, and persuade them to issue a loan.

Accordingly, in our opinion the search of Kaye's briefcase was not the product of an illegal arrest in violation of the fourth amendment.

### III. The Search

As an independent ground for the suppression of the evidence obtained from Kaye's briefcase, the defendants argue that under *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), the agents were required to obtain a search warrant prior to opening and searching the seized case. *See Arkansas v. Sanders,* —— U.S. ——, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979).[4]

At the outset we hold that defendant Calandrella does not have standing to complain about the search of Kaye's briefcase. As noted above, he has claimed no property or privacy interest in the briefcase or its contents. Accordingly, for the reasons stated previously, no right of his has been violated and he is not entitled to invoke the exclusionary rule. *See Rakas v. Illinois, supra; United States v. Killebrew, supra.*

As regards defendant Kaye, we agree with his contention that under *Chadwick, supra,* and *Sanders, supra,* the FBI agents were required to procure a search warrant before opening his briefcase once it was reduced to their exclusive possession. We

reject the government's claim that under *Chadwick* the search of the briefcase at the FBI office could validly be viewed as incident to the arrest. We are of the opinion, however, that the evidence procured in the search need not be suppressed because we hold that *Chadwick* is not to be retroactively applied.

### A.

*United States v. Chadwick, supra,* involved a 200 pounds footlocker which was seized at the time of the arrest of two suspects for the illegal possession of drugs. The agents had probable cause to believe that the footlocker contained a controlled substance and they arrested Chadwick and a companion after the two men had placed the footlocker in the trunk of a waiting automobile. Following the arrest, the defendants and the footlocker were taken to the local federal building. Sometime later, the agents opened the footlocker without either a warrant or consent. 433 U.S. at 3–5, 97 S.Ct. 2476.

As in this case, the defendants in *Chadwick* did not contest the legality of the initial seizure of the footlocker. *Id.* at 13, 97 S.Ct. 2476. As regards the later search, the government argued, *inter alia,* that it was justifiable as a search incident to a lawful arrest under *Chimel v. California,* 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). Rejecting that argument, the court stated:

> Here the search was conducted more than an hour after federal agents had gained exclusive control of the footlocker and long after respondents were securely in custody; the search therefore cannot be viewed as incidental to the arrest or as justified by any other exigency. Even though on this record the issuance of a warrant by a judicial officer was reasonably predictable, a line must be drawn. In our view, when no exigency is shown

---

4. We note that the defendants did not articulate this argument in the District Court. We believe, however, that it may be considered here. The defendants did seek suppression, albeit on other grounds. Also, the alleged error involves a matter of constitutional dimension

and we believe that the present record is adequate to present the issue. Accordingly, we decline the government's invitation to refuse to consider the question. *See Anderson v. United States,* 417 U.S. 211, 217 & n. 5, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974). *See also* note 5, *infra.*

to support the need for an immediate search, the Warrant Clause places the line at the point where the property to be searched comes under the exclusive dominion of police authority. Respondents were therefore entitled to the protection of the Warrant Clause with the evaluation of a neutral magistrate, before their privacy interests in the contents of the footlocker were invaded. 433 U.S. at 15–16, 97 S.Ct. at 2485–2486.

More recently, in *Arkansas v. Sanders, supra,* the court applied *Chadwick* to the search of unlocked luggage seized from the trunk of a taxicab. The cab had been stopped without a warrant because the officers had probable cause to believe that the suitcase in the trunk contained marijuana. Immediately upon seizing the item, the officers opened it and searched it without either a warrant or the consent of the suspects. Upon finding marijuana in the suitcase, the two suspects were placed under arrest. —— U.S. ——, 99 S.Ct. 2586. Affirming the Supreme Court of Arkansas, the court held that the officers should have taken the suitcase to the police station and obtained a search warrant before opening it. *Id.* at ——, 99 S.Ct. 2586.

In *Sanders,* the court emphasized the basic fourth amendment principle that most searches must be both reasonable and pursuant to a warrant. *Id.* at ——, 99 S.Ct. 2586. By requiring the facts to be presented to a "neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime," *Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948), "the risk of unreasonable assertions of executive authority" is minimized. *Sanders v. Arkansas, supra,* —— U.S. at ——, 99 S.Ct. at 2590.

■ Exceptions to the warrant requirement exist, however; and in *Chadwick* the court reaffirmed the one which is applicable to searches incident to a lawful arrest. 433 U.S. at 14–15, 97 S.Ct. 2476. Such searches are justified by the need to disarm an arrested person and by the need to remove destructible evidence from within his reach.

*Chimel v. California, supra,* 395 U.S. at 763, 89 S.Ct. 2034. Thus the arresting officers may search the area within the suspect's "immediate control" at the time of the arrest. *Id.* In addition, the officers may conduct a full body search of the arrested person, including items found on his person. *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). The constitutionality of such searches of the person does not depend on the existence of independent probable cause for the search or on the existence of a search warrant. *Michigan v. DeFillippo,* —— U.S. ——, ——, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979). It is the arrest of the suspect that is viewed as the significant intrusion under the fourth amendment. The further intrusion of the search of his person is considered incidental and does not require additional justification. *United States v. Robinson, supra,* 414 U.S. at 235, 94 S.Ct. at 476 (majority opinion), 237, 94 S.Ct. at 477 (concurring opinion). This being so, the police may lawfully delay their search of the suspect's intimate belongings until after he is incarcerated. *United States v. Edwards,* 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974); *see United States v. Berry,* 560 F.2d 861 (7th Cir. 1977), *vacated on other grounds,* 571 F.2d 2 (7th Cir.), *cert. denied,* 439 U.S. 840, 99 S.Ct. 129, 58 L.Ed.2d 138 (1978).

*Chadwick* establishes a limit on the validity of warrantless searches of the property of an arrested person. The court there explained that an individual has a legitimate expectation of privacy in the contents of a container such as a footlocker which differs from the expectation of privacy associated solely with the person. The court distinguished searches of a suspect's person (and intimate belongings) as follows:

> Unlike searches of the person, *United States v. Robinson,* 414 U.S. 218 [94 S.Ct. 467, 38 L.Ed.2d 427] (1973); *United States v. Edwards,* 415 U.S. 800 [94 S.Ct. 1234, 39 L.Ed.2d 771] (1974), searches of possessions within an arrestee's immediate control cannot be justified by any reduced expectations of privacy caused by the arrest. Respondents' privacy in-

terest in the contents of the footlocker was not eliminated simply because they were under arrest. [433 U.S. at 16 n. 10, 97 S.Ct. at 2486.]

The court also explained that the search of the footlocker must be viewed as a far greater intrusion under the fourth amendment than the mere seizure of the item because of the primary fourth amendment interest in the privacy of the contents of the footlocker, not in the simple possession of the receptacle. *Id.* at 13–14 n. 8, 97 S.Ct. 2476.

This reasoning was more recently applied in *Sanders,* where the court found that the contents of an unlocked suitcase were clothed with the same legitimate expectation of privacy as the contents of Chadwick's footlocker because the "very purpose" of such luggage is to transport personal items. —— U.S. at ——, 99 S.Ct. 2586.

Finally, the court in *Chadwick* noted that "warrantless searches of luggage or other property seized at the time of an arrest cannot be justified as incident to that arrest either if the 'search is remote in time or place from the arrest,' *Preston v. United States,* 376 U.S. [364] at 367 [84 S.Ct. 881, at 883, 11 L.Ed.2d 777], or no exigency exists." 433 U.S. at 15, 97 S.Ct. at 2485.

In this case, the briefcase was seized from the defendant at the time of his arrest in the bank. Thereafter, it was within the government's "exclusive dominion." *United States v. Chadwick, supra,* 433 U.S. at 15, 97 S.Ct. 2476. The agents transported it to the FBI office along with the defendant. There, the briefcase was opened and searched.

▮ We believe that the defendant's privacy interest in his briefcase, as a repository for personal papers, is indistinguishable from the suitcase in *Sanders,* or the footlocker in *Chadwick.* In each case the container's "very purpose" is to transport papers and other items of an inherently personal, private nature. *Arkansas v. Sanders, supra,* —— U.S. ——, 99 S.Ct. 2586.[5] Thus, we believe that the valid arrest of the defendant did not eliminate his privacy interest in the briefcase.

▮ Although the briefcase was apparently within the immediate area around the defendant at the time he was arrested, *see Chimel v. California, supra,* we believe that once the agents had seized the item and reduced it to their exclusive control there was no further danger that the defendant would secure therefrom either a weapon or an instrumentality of escape, or would destroy evidence contained in the briefcase. *United States v. Chadwick, supra,* 433 U.S. at 15, 97 S.Ct. 2476. Thus the interests sought to be protected by permitting warrantless searches incident to an arrest were fully vindicated by the seizure of the briefcase at the time of the arrest. *See United States v. Robinson, supra; Preston v. United States,* 376 U.S. 364, 376, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964).

Additionally, the government has offered no exigency or other justification for the warrantless search of the briefcase. *See United States v. Chadwick,* 433 U.S. at 15 & n. 9, 97 S.Ct. 2476, *cf. United States v. Haley,* 581 F.2d 723 (8th Cir.) (exigent circumstances found in the presence of a potential medical emergency), *cert. denied,* 439 U.S. 1005, 99 S.Ct. 618, 58 L.Ed.2d 681 (1978); *United States v. Pugh,* 566 F.2d 626 (8th Cir. 1977) (per curiam) (partially opened briefcase validly searched pursuant to the plain view exception to the warrant requirement), *cert. denied,* 435 U.S. 1010, 98 S.Ct. 1885, 56 L.Ed.2d 393 (1978); *United States v. Matlock,* 558 F.2d 1328 (8th Cir.) (search of opened briefcase justified where weapons had already been found in vehicle and where arrested person's wife was re-

---

5. The government has suggested that this case should be remanded for further proceedings because it is not clear whether the briefcase was locked at the time it was opened and searched. We believe that this is unnecessary because the factual point is irrelevant. In *Sanders,* the court explained that the "respondent's failure to lock his suitcase [did not] alter its fundamental character as a repository for personal, private effects." —— U.S. at —— n. 9, 99 S.Ct. at 2592 n. 9.

moving an unknown object from the briefcase), *cert. denied,* 434 U.S. 872, 98 S.Ct. 218, 54 L.Ed.2d 152 (1977).[6]

■ Accordingly, for the above reasons, we believe that *Chadwick* applies to searches of the sort carried out in this case, and requires a warrant prior to their effectuation. The question remains, however, whether the exclusionary rule must be applied retroactively to this case, since the search occurred on April 11, 1977, more than two months prior to the court's decision in *Chadwick.*

**B.**

In *United States v. Peltier,* 422 U.S. 531, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975), the Supreme Court considered the question of the retroactive application of fourth amendment search and seizure decisions. At the outset the court explained:

> Since 1965 this Court has repeatedly struggled with the question of whether rulings in criminal cases should be given retroactive effect. In those cases "[w]here the major purpose of new constitutional doctrine is to overcome an aspect of the criminal trial that substantially impairs its truth-finding function and so raises serious questions about the accuracy of guilty verdicts in past trials," *Williams v. United States,* 401 U.S. 646, 653, 91 S.Ct. 1148, 1152, 28 L.Ed.2d 388 (1971), the doctrine has quite often been applied retroactively. It is indisputable, however, that in every case in which the Court has addressed the retroactivity problem in the context of the exclusionary rule, whereby concededly relevant evidence is excluded in order to enforce a constitutional guarantee that does not relate to the integrity of the factfinding process, the Court has concluded that any such new constitutional principle would be accorded only prospective application. [*Id.* at 535, 95 S.Ct. at 2316 (citing cases).]

**6.** We note that in *United States v. Ochs,* 595 F.2d 1247 (2d Cir. 1979), and in *United States v. Milhollan,* 599 F.2d 518 (3d Cir. 1979), the courts upheld searches of briefcases found in automobiles under the authority of *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26

The court identified two policies as supporting the exclusionary rule: (1) the "imperative of judicial integrity," *Elkins v. United States,* 364 U.S. 206, 222, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960); and (2) the deterrence of illegal police conduct, which is more commonly cited as the reason for the rule's existence. *United States v. Peltier, supra,* 422 U.S. at 536, 95 S.Ct. 2313.

After reviewing the decisions on retroactivity, the court concluded as regards the policy of maintaining judicial integrity, that:

> The teaching of these retroactivity cases is that if the law enforcement officers reasonably believed in good faith that evidence they had seized was admissible at trial, the "imperative of judicial integrity" is not offended by the introduction into evidence of that material even if decisions subsequent to the search or seizure have broadened the exclusionary rule to encompass evidence seized in that manner. [*Id.* at 537, 95 S.Ct. at 2317.]

The court continued:

> It would seem to follow *a fortiori* from the *Linkletter* [*Linkletter v. Walker,* 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601] and *Fuller* [*Fuller v. Alaska,* 393 U.S. 80, 89 S.Ct. 61, 21 L.Ed.2d 212] holdings that the "imperative of judicial integrity" is also not offended if law enforcement officials reasonably believed in good faith that their *conduct* was in accordance with the law even if decisions subsequent to the search or seizure have held that conduct of the type engaged in by the law enforcement officials is not permitted by the Constitution. For, although the police in *Linkletter* and *Fuller* could not have been expected to foresee the application of the exclusionary rule to state criminal trials, they could reasonably have entertained no similar doubts as to the illegality of their conduct. See *Wolf*

L.Ed.2d 419 (1969). The continued validity of *Ochs* and of *Milhollan* in some doubt following the Supreme Court's later decision in *Sanders, supra. See* —— U.S. at —— –— —— & n. 14, 99 S.Ct. 2586; *cf. United States v. Vickers,* 599 F.2d 132 (6th Cir. 1979).

*v. Colorado,* 338 U.S. [25], at 27 [69 S.Ct. 1359, at 1361, 93 L.Ed. 1782]; § 605 of the Federal Communications Act of 1934; *cf. Nardone v. United States,* 302 U.S. 379 [58 S.Ct. 275, 82 L.Ed. 314] (1937). [*Id.* at 537–38, 95 S.Ct. at 2317–2318 (emphasis original).]

As regards the deterrence rationale, the court reached a similar conclusion, stating:

If the purpose of the exclusionary rule is to deter unlawful police conduct, then evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment. [*Id.* at 542, 95 S.Ct. at 2320.]

Finally, the court also noted that earlier decisions have pointed to the added burden on the administration of justice as a consideration in retroactivity analysis. 422 U.S. at 534 n. 4, 95 S.Ct. 2313 quoting *Stovall v. Denno,* 388 U.S. 293, 297, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

In this case we believe that the agents acted reasonably and should not be charged with the knowledge that the search of Kaye's briefcase was illegal. In our opinion *Chadwick* marked a shift in the law, even if it did not expressly overrule any prior Supreme Court decisions. *See United States v. Berry,* 560 F.2d 861, 863–64 (7th Cir. 1977), *vacated on other grounds,* 571 F.2d 2 (7th Cir.), *cert. denied,* 439 U.S. 840, 99 S.Ct. 129, 58 L.Ed.2d 138 (1978). *See also United States v. Peltier, supra,* 422 U.S. at 544–49, 95 S.Ct. 2313 (Brennan, J., dissenting).

As explained above in Part A, prior to *Chadwick,* the law was clear that officers were entitled to search fully items found on an arrestee's person incident to his arrest. *E. g., United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). Further, in *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), the court had upheld, albeit without separate discussion, the search of a zippered handbag as incident to an arrest. *Id.* at 314, 79 S.Ct. 329. More recently, in *United States v. Edwards,* 415 U.S. 800, 94 S.Ct.

1234, 39 L.Ed.2d 771 (1974), the court stated without apparent limitation:

It is also plain that searches and seizures that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention. If need be, *Abel v. United States,* 362 U.S. 217 [80 S.Ct. 683, 4 L.Ed.2d 668] (1960), settled this question. . . .

The courts of appeals have followed this same rule, holding that both the person and the property in his immediate possession may be searched at the station house after the arrest has occurred at another place and if evidence of crime is discovered, it may be seized and admitted in evidence. [*Id.* at 803, 94 S.Ct. at 1237.]

In this Circuit, prior to *Chadwick,* the agents were entitled to rely on the opinion in *United States v. Kaye,* 492 F.2d 744 (6th Cir. 1974) (per curiam), which upheld the search of a suitcase seized incident to a valid arrest. Relying on *United States v. Robinson, supra,* the court stated that a search incident to an arrest extends to a suitcase even after the item has been seized and the suspect subdued. *Id.* at 746. *Accord, United States v. Gill,* 555 F.2d 597 (6th Cir. 1977) (per curiam); *cf. United States v. Wright,* 577 F.2d 378, 380–81 (6th Cir. 1978) (opinion recognizes the prior holding in *Kaye,* and notes that *Chadwick* probably changed the law in this Circuit with regard to searches of luggage incident to an arrest).

The decisions of other courts were to the same effect. *E. g., United States v. French,* 545 F.2d 1021 (5th Cir. 1977) (per curiam); *United States v. Schleis,* 543 F.2d 59 (8th Cir. 1976), *vacated,* 433 U.S. 905, 97 S.Ct. 2968, 53 L.Ed.2d 1089 (1977), *on remand,* 582 F.2d 1166 (8th Cir. 1978) (en banc); *United States v. Eatherton,* 519 F.2d 603, 610–11 (1st Cir.), *cert. denied,* 423 U.S. 987, 96 S.Ct. 396, 46 L.Ed.2d 304 (1975); *United States v. Battle,* 166 U.S.App.D.C. 396, 398–99, 510 F.2d 776, 778–79 (D.C.Cir. 1975); *United States v. Ciotti,* 469 F.2d 1204 (3d Cir. 1972), *vacated on other grounds,* 414 U.S. 1151, 94 S.Ct. 907, 39

L.Ed.2d 105 (1974); *United States v. Mehciz,* 437 F.2d 145 (9th Cir.), *cert. denied,* 402 U.S. 974, 91 S.Ct. 1663, 29 L.Ed.2d 139 (1971). *See also United States ex rel. Muhammad v. Mancusi,* 432 F.2d 1046 (2d Cir. 1970) (per curiam), *cert. denied,* 402 U.S. 911, 91 S.Ct. 1391, 28 L.Ed.2d 653 (1971).

■ Since law enforcement personnel were entitled to rely on the cases just cited and discussed as establishing the legality prior to *Chadwick* of searches such as the one at issue in this case, we believe that neither the "imperative of judicial integrity" nor the "deterrent purpose served by the exclusionary rule" would be served by the retroactive application of the exclusionary rule in this case. 422 U.S. at 536, 95 S.Ct. at 2317. In so holding, we agree with the Second, Fifth, Seventh and Ninth Circuits, which have so held. *United States v. Reda,* 563 F.2d 510 (2d Cir. 1977) (per curiam), *cert. denied,* 435 U.S. 973, 98 S.Ct. 1617, 56 L.Ed.2d 65 (1978); *United States v. Montgomery,* 558 F.2d 311 (5th Cir. 1977) (per curiam); *United States v. Berry,* 571 F.2d 2 (7th Cir.), *cert. denied,* 439 U.S. 840, 99 S.Ct. 129, 58 L.Ed.2d 138 (1978); *United States v. Choate,* 576 F.2d 165, 182 n. 20 (9th Cir.), *cert. denied,* 439 U.S. 953, 99 S.Ct. 350, 58 L.Ed.2d 344 (1978); *see Vaughn v. United States,* 47 U.S.L.W. 3829 (1979). We disagree with the Eighth Circuit, which has held otherwise. *United States v. Schleis,* 582 F.2d 1166, 1173–74 (8th Cir. 1978) (en banc).[7]

The defendant's principal argument for retroactive application of *Chadwick* is that the Supreme Court has allegedly so held *sub silentio* when it decided *Arkansas v. Sanders,* —— U.S. ——, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979), and when it denied certiorari in *United States v. Stevie,* —— U.S. ——, 99 S.Ct. 3102, 61 L.Ed.2d 876 (1979). The defendant points out that the search in *Sanders* occurred prior to the decision in *Chadwick,* and that the Eighth Circuit's decision in *Stevie* referred to its own prior decision on the retroactivity issue.

■ This argument is without merit. In *United States v. Peltier, supra,* the court explained that the resolution of cases applying a recently announced principle does not impair or affect the court's later determination of the question of retroactivity. 422 U.S. at 535 n. 5, 95 S.Ct. 2313. Thus, since retroactivity was not discussed in *Sanders,* it was not resolved by the decision in *Sanders.* And the denial of certiorari imports with it no statement on the merits of a case. *Brown v. Allen,* 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953); *United States v. Carver,* 260 U.S. 482, 490, 43 S.Ct. 181, 67 L.Ed. 361 (1923).

The defendant also submits that the courts which have held *Chadwick* nonretroactive have done so without considering the significance of the order of remand in *Schleis,* 433 U.S. 905, 97 S.Ct. 2968, 53 L.Ed.2d 1089 (1977); *see United States v. Ochs,* 595 F.2d 1247, 1255 (2d Cir. 1979). In the defendant's view, "it would have been an exercise in futility for the Supreme Court to have remanded *Schleis* had it not intended *Chadwick* to apply to pre-*Chadwick* searches." Reply Brief for Appellant at 7 n. 3. We decline to adopt the defendant's single minded view of the significance of the court's order, since it is at least equally likely that the court remanded the case in order to permit the Eighth Circuit to consider, *inter alia,* the question of retroactivity.

■ In sum, we believe that *Chadwick* requires officers to obtain search warrants prior to opening closed briefcases and luggage once those items are lawfully seized and are within the exclusive control of the police. We are also of the opinion, however, that *Chadwick* is not to be retroactively applied so that the exclusionary rule does

---

**7.** Defendant Kaye contends that in *United States v. Diggs,* 569 F.2d 1264 (3d Cir. 1977), the Third Circuit resolved the retroactivity question in his favor because it applied *Chadwick* to a pre-*Chadwick* search. The Third Circuit did not even mention, much less resolve the retroactivity issue in *Diggs.*

The defendant has also cited a decision of the Ninth Circuit in *United States v. Vaughn,* 577 F.2d 753 (9th Cir. 1978). The opinion was designated by the court as "Memorandum" and "not for publication." Under Ninth Circuit Rule 21(a), (c), such decisions are not regarded as precedent and may not be cited.

not apply in this case and the evidence seized from Kaye's briefcase need not be suppressed.

## IV. The Sufficiency of the Evidence as to Count III

The defendants were convicted on count III of the indictment which charged that they transmitted or caused the transmission of a telex from Seven Oak to the Louisville Trust Bank in furtherance of a scheme to defraud, in violation of 18 U.S.C. §§ 2, 1343.[8] In the defendants' view, they were at most aiders and abettors and they find the evidence insufficient to show that any of their co-defendants acted as principal in actually sending the telex.

▇▇▇ This argument misses the mark. The operative language of section 1343 requires only that a person "transmits *or causes to be transmitted* . . . any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme. . . ." (Emphasis supplied.) Similar operative language is contained in the analogous mail fraud statute, 18 U.S.C. § 1341. This similarity has been held to require that the sections be interpreted with equal breadth. *United States v. Calvert,* 523 F.2d 895, 903 (8th Cir. 1975), *cert. denied,* 424 U.S. 911, 96 S.Ct. 1106, 47 L.Ed.2d 314, 98 L.Ed. 435 (1976). We agree with this conclusion. Thus the language of the Supreme Court in *Pereira v. United States,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 363 (1954), is applicable here:

> Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he "causes" the mails to be used.

*See United States v. Talbott,* 590 F.2d 192 (6th Cir. 1978).

▇▇▇ Judged by this standard, we are confident that the evidence was sufficient to establish that Kaye and Calandrella, as principals, "caused" the sending of the telex from Seven Oak to the bank which confirmed that Kaye had the right to use the CD as "backup collateral." Kaye had actively sought to help put bank officials in touch with Calandrella and with Seven Oak in the expectation that the bank would receive just this sort of assurance. Kaye contacted Calandrella who in turn, the evidence tended to show, contacted Seven Oak. The result a few days later was the first telex sent from Seven Oak. The telex was reasonably foreseeable following each of the defendant's actions.

Additionally, as regards defendant Kaye, we believe that the evidence was also sufficient to show that he aided and abetted defendant Calandrella in causing the telex to be sent. *See* 18 U.S.C. § 2.

## V. The Testimony of Clifford Fallen

▇▇▇ The defendants find reversible error in the admission of the testimony of one Clifford Fallen over their timely objections. The substance of his testimony was that he had invested some $127,000 with the defendant Kaye. The money was supposed to go toward a coal venture, but Kaye's records indicated that at least some of the money, in the form of CD's, ended up in Martini Packing Company, one of Globe's subsidiaries. Fallen explained a series of meetings and transactions he had had with Kaye over the proposed coal venture, and he stated that he never recovered his investment. Kaye's transactions with Fallen were not the subject of criminal charges

---

8. 18 U.S.C. § 1343 provides:

 § 1343. Fraud by wire, radio, or television. Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not

more than $1,000 or imprisoned not more than five years.

18 U.S.C. § 2 provides:

§ 2. Principals

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or produces its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

and were not otherwise part of the indictment. The court admitted the evidence for the limited purpose of showing Kaye's intent or his mode of operations generally. The court further instructed the jury that no statement attributed to Kaye could be used against Calandrella unless other evidence established the existence of a conspiracy between them.

The defendants do not deny that the testimony was relevant to show Kaye's business acumen and general method of operations. They claim, however, that the court abused its discretion in admitting the evidence because it was unfairly prejudicial to permit the jury to consider evidence from which they could have concluded that Kaye had defrauded Fallen.

We find no abuse of discretion in the District Court's refusal to exclude the evidence on the ground of unfair prejudice under Fed.R.Evid. 403. Defendant Kaye's basic defense was that he was not aware of the nature of the transactions involving Seven Oak and that he was in effect duped. The evidence tended to show Kaye's level of business sophistication in transactions involving his companies and thus it tended to contradict this claim. The evidence further contradicted the contention that Kaye was merely a consultant and that his son actually ran Globe and Martini Packing.

This case is thus unlike *United States v. McFadyen-Snider,* 552 F.2d 1178 (6th Cir. 1977), *cert. denied,* 435 U.S. 995, 98 S.Ct. 1647, 56 L.Ed.2d 84 (1978), on which the defendants rely, where the disputed evidence had little or no relevance to the crimes charged or the defenses alleged. *Id.* at 1184.

Additionally, we do not believe that the evidence could have seriously prejudiced defendant Calandrella at all since it was shown that he had no dealings with Fallen. Moreover, the District Court specifically cautioned the jury concerning the use of the evidence against Calandrella. Thus we find no reversible error in the admission of Fallen's testimony.

## VI. The Closing Argument

The defendants find prejudicial error in the following isolated remark of the government prosecutor during closing argument:

There is no difference in [sic] these guys and people that go out and stick up banks.

Conceding that they made no objection to this at trial, the defendants contend that the statement is plain error requiring reversal. In likening the defendants to armed, violent men, Kaye and Calandrella maintain that the prosecutor was arguing outside the record and was inflaming the jurors.

We disagree. Although federal prosecutors must comply with the high standard of conduct first enunciated in *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), *see United States v. Bess,* 593 F.2d 749 (6th Cir. 1979), they are nonetheless given "a certain degree of latitude in summation." *United States v. Barker,* 553 F.2d 1013, 1025 (6th Cir. 1977). Although improper, we do not believe that the isolated remark quoted above was sufficiently prejudicial to rise to the level of plain error. It did not vitiate the trial which was conducted free from prejudicial error.

## VII. The Court's Instructions

The defendants' only complaint concerning the District Court's instructions to the jury relates to the following concededly inadvertent remark: One who violates section 1343 "shall be fined not more than $1000—excuse me. Delete that. Sentencing is up to the court. That is what the statute says."

Later, after raising several other objections to the instructions, counsel for the defendants complained about the above-quoted reference to the penalty portion of the statute and moved for a mistrial. The defendants maintained that the court should have read the entire penalty provision so that the jury would not be led to convict on the belief that the only penalty would be a fine. The court overruled all of the defendants' motions and gave the following curative instruction:

Ladies and gentlemen of the jury, I inadvertently mentioned with reference to

Count Three of the indictment, a portion of the penalty provision of that statute. As I stated at that time, you are not to concern yourself in any way with the penalty provisions of any statute because your only duty in this case, and it is a solemn duty, is to determine the guilt or innocence of the defendants in this case. So please disregard, I inadvertently said something about it, please disregard it and strike it completely from your mind.

In these appeals, the defendants have repeated their contentions, likening this case to one where the judge offers a jury two sets of instructions, one of which is incorrect, and it is impossible to tell which one the jury followed.

We disagree. We believe that the court's curative instruction was adequate to eliminate any possible prejudice and reject the defendants' claim that the jury was likely misled. *See United States v. Davidson,* 367 F.2d 60, 63–65 (6th Cir. 1966).

### VIII. The Sentencing of Kaye

■ Defendant Kaye, points to the following statements of the court as evidencing reversible error in sentencing:

The Court: All right. Let the record reflect that the Court in imposing sentence will never consider anything except the—does not consider particularly in this case anything except the prior conviction of Mr. Kaye and the evidence introduced against him at the trial of this action, which did reflect that one individual was defrauded of some $70,000, minimum of $70,000, possibly as much as $127,000. I think that's sufficient as to what transpired at the trial.[9]

In the defendant's view, this remark shows that the court improperly considered Clifford Fallen's testimony as having shown that he was defrauded by Kaye. Kaye submits that nothing in Fallen's testimony directly indicates any such illegality. We reject this argument.

Kaye concedes that courts have wide latitude in the matters that may be considered in determining the appropriate sentence. *E. g., United States v. Tucker,* 404 U.S. 443, 446–47, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972). Certainly this includes the evidence produced at trial. As noted above, Fallen's testimony (if that is what is being referred to in the above passage) showed that he had invested funds with Kaye in the belief that they would be used to purchase coal property. Kaye's records showed, however, that the money was apparently diverted to other purposes. Fallen never recovered his investment. We note that Kaye's contention here that the evidence disclosed no fraud is at odds with his contention in Part V that the jury might well have drawn precisely that conclusion from Fallen's testimony. We find no abuse of discretion in the court's consideration of this evidence as it decided on the appropriate sentence. *Cf. Collins v. Buchkoe,* 493 F.2d 343, 345 (6th Cir. 1974) (per curiam).

The sentences imposed were permitted by the statutes for the violation of which appellants were convicted. We see no reason to remand for resentencing.

The judgments of convictions are affirmed.

---

9. Kaye was convicted of a securities law violation in the Southern District of New York in 1959.