**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Arthuro MONTANO,**
**Defendant-Appellant.**

No. 78–5320.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 13, 1978.

Decided Jan. 4, 1980.

---

Nicholas Smith, Westland, Mich., for defendant-appellant.

James K. Robinson, U. S. Atty., Samuel C. Damren, Asst. U. S. Atty., Detroit, Mich., for plaintiff-appellee.

Before EDWARDS, Chief Judge, WEICK, Circuit Judge, and PECK, Senior Circuit Judge.

JOHN W. PECK, Senior Circuit Judge.

By indictment filed December 21, 1977, defendant-appellant Arthuro Montano and one Elroy Augustine Garcia were charged with unlawfully possessing with intent to distribute (and with aiding and abetting) a quantity of cocaine in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 18. Both were found guilty as charged by a jury, and Montano perfected the appeal which is herein dealt with.

Montano's arrest was the culmination of an extensive drug investigation. In July, 1977, an undercover Drug Enforcement Administration agent set up a sale with a drug dealer. At one point during their negotiation, the dealer pointed out a man in a nearby automobile to the agent, describing him as "my man, Artie." Sometime later, the sale was consummated and in the course of the exchange, the dealer commented that "Artie" was at a nearby Holiday Inn. The dealer was followed to the Holiday Inn, where he met with a man later identified as Montano.

A few weeks later, a confidential informant told the Detroit DEA that the dealer and "Artie" were going to Florida for a major heroin transaction. Contact was made with the dealer, and another sale was set up, this time in Pittsburgh. During the course of that sale, the dealer made a phone call to "Artie" in Room 229 of the Compton Village Motel, in Livonia, Michigan. The Pittsburgh DEA then contacted the Detroit DEA and informed them of the arrest, and further advised that a warrant was being sought for "Artie."

Without waiting for the warrant, the Detroit DEA decided to go ahead with the arrest. Four agents went to the Compton Village Motel, where the desk clerk told them that Room 229 was registered to an "A. Montano" and that there were two other adults in the room. The registration slip showed that his car had Florida license plates. The agents proceeded to the motel room and knocked. A few moments later the door was opened a few inches (it was secured with a safety chain) by a man, and the agent testified that he immediately recognized him as one of the men the arrested dealer had met at the Holiday Inn. He asked, "Are you Artie?" and the man re-

sponded "Yes." The lead agent applied pressure to the door, causing an end of the chain which was fastened into the molding or trim around the door to come free. He thereupon entered the room, announcing immediately thereafter that they were police officers, and he placed "Artie" (who was subsequently identified as Arthuro Montano) under arrest.

The room was a typical, rather small motel room (one witness estimated it to be 12′ × 18′, another as 14′ × 18′), and contained two double beds. Montano's wife was in one bed, while their infant son and Augustine Garcia were in the other. All of them had apparently been asleep in the darkened room, and the child remained asleep throughout the ensuing proceedings. One of the agents immediately turned on the lights, and the adults got out of bed. Montano was wearing undershorts only, Garcia undershorts and a T-shirt or undershirt, and the lady put on a robe or covering garment over a nightgown.

One of the agents then saw the end of a suitcase protruding from beneath one of the beds on the floor between the beds. He picked it up, and as he was opening it said to Montano, "Is this yours?", to which Montano responded, "Yes." The agent observed therein an open zipper shaving kit stuffed with large denomination currency (a subsequent count disclosed the amount to be approximately $40,000). Also in the suitcase was a brown paper bag containing eleven "baggies," or plastic sandwich bags, which contained a white powder resembling (and later proven to be) cocaine. Simultaneously, another agent opened a flight bag also found in the room, which contained, along with some clothing, three "sifters" which testimony established were capable of being used in cutting, or adulterating, cocaine. The suitcase itself, the cocaine and the currency, as well as the sifters, were received in evidence.

■ Two of Montano's contentions on appeal may be rather summarily dealt with. He first argues that his arrest was illegal because the agents did not have probable cause to believe that he had committed an offense. However, at that time the agents knew that the dealer arrested in Pittsburgh had an associate named "Artie," that that dealer had made a call to the motel room to "Artie," and that the motel room was let to someone with the first initial "A" who had Florida license plates. They also knew that a confidential informant had told them the dealer and Artie had recently made a trip to Florida for the purpose of purchasing drugs. Finally, when Montano answered the knock, he was recognized as a man who had been seen with the arrested dealer, and he verbally acknowledged that he was "Artie." In response, the Government argues that the likelihood of immediate flight, and the fact that if "Artie" escaped he could never be captured since they did not know who he was, justified the immediate warrantless arrest. We hold that these circumstances constituted sufficient probable cause for the agents to believe that Montano had committed an offense, and that the arrest was accordingly legal.

■ Montano further contends that his statements concerning his ownership of the suitcase were improperly received, since he had not been read his rights. At about the time of his arrest, the agents were discussing among themselves the question as to whether the other adults should be placed under arrest, and if so, what was to be done with the infant. Montano said, in effect, "They don't know anything about it. Leave them here. It's my stuff." We hold that this and whatever other contemporaneous statements were made were volunteered statements which do not fall within the purview of the *Miranda* guidelines, *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and that his alleged fears for his wife and child do not alter the fact that the statements were not the product of a custodial interrogation. Similarly, with the two exceptions hereinafter discussed, we conclude that the further contentions of the appellant are without merit.

■ The two exceptions are, first, the "no-knock" entry into the motel room, and, second, the search of the suitcase. On these

two issues, as their opinions filed herein indicate, the members of the panel are not in agreement. This writer, while recognizing the serious problems arising from the manner in which the entry into the motel room was effected, would not reach that issue, because it is my conclusion that no such exigent circumstances existed as would justify the search of the suitcase.

The following excerpt from the testimony of one of the agents sets the scene:

Q. You did secure the persons so that you knew exactly where everybody was and what they were doing?

A. Immediately when we walked in, we secured them. We advised them not to move. That was our initial instruction.

Q. That was for your safety, as you have indicated, as well as those persons in the room?

A. Yes.

Q. And did you at that point make any cursory search for weapons on the persons that were in the room?

A. Our immediate response was for everyone to freeze. Then one by one or simultaneously an agent would take each person and get them out of bed, have them get out very slowly for everyone's protection.

Another agent testified, "Our first priority was to get the individuals and their hands in plain sight, and [we] had no difficulty getting the men in plain view so that they couldn't in any way secretly grab any weapon or anything else. . . . [We wanted] to make sure it was safe to proceed further. At that point, everyone remained still." Only then, with security assured, did one of the agents pull the suitcase from under one of the beds, place it on the bed, and open it. With reference to such a situation, the Supreme Court in *Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969), held:

There is no . . . justification . . . for routinely searching any room other than that in which an arrest occurs—*or, for that matter, for searching through all the desk drawers or other closed or con-cealed areas in that room itself.* Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant. The "adherence to judicial processes" mandated by the Fourth Amendment requires no less. (Footnote omitted; emphasis added.)

One of the "well recognized exceptions," permits the opening of luggage where exigent circumstances exist. *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977). Keeping in mind that four agents had three suspects at bay in a well lighted room it is difficult to see how at that moment in time exigent circumstances existed which could have justified the opening of the suitcase. I cannot believe that the remote possibility of one of the adult's opening the suitcase and procuring either a weapon or destructible evidence constituted such an exigency, and thereby provided such justification. Incidentally, a thorough search of the entire room and bathroom failed to produce any weapon.

Although it is not the stated basis of the dissenting opinion in this regard, it seems to rely at least in part on the fact that drug oriented offenses were involved, observing that the defendant "was known to be involved in the narcotics trade at a level where the use of weapons is common," and that he "has a long history of arrests and convictions for crimes involving violence and narcotics, so he might well have been a good deal more dangerous than the agents even believed." However, while in the common good a different set of rules might appropriately govern searches and seizures made in connection with drug offenses than in situations concerning less monstrous and invidious crime, if such distinctions are to be made, they must be the product of the legislature. In the present state of the law, no such distinction is permissible.

Indeed, not even murder can be placed in a different category by the courts, the Supreme Court held in *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). Therein police conducted a thorough and intrusive but warrantless search

of the defendant's home in the course of a murder investigation. He went to trial under a five-count indictment and his subsequent murder and assault convictions were vacated by the Supreme Court of Arizona. The Supreme Court granted certiorari to consider the validity of conviction of three counts of narcotics violations based largely on the drugs seized in the search. In the opinion reversing the narcotics convictions, in response to the State's argument concerning "the vital public interest in the prompt investigation of the extremely serious crime of murder," Mr. Justice Stewart stated, "No one can doubt the importance of this goal. But the public interest in the investigation of other serious crimes is comparable. If the warrantless search of a homicide scene is reasonable, why not the warrantless search of the scene of a rape, a robbery, or a burglary? 'No consideration relevant to the Fourth Amendment suggests any point of rational limitation' of such a doctrine. *Chimel v. California, supra*, 395 U.S. at 766, 89 S.Ct. at 2041." Justice Stewart further stated, "We decline to hold that the seriousness of the offense under investigation itself creates exigent circumstances of the kind that under the Fourth Amendment justify a warrantless search." *Mincey, supra,* 437 U.S. at 393–394, 98 S.Ct. at 2414–15.

As not infrequently occurs in cases concerning search and seizure, the line between good police work and a violation of rights is a very thin one. I am forced to the conclusion that in this instance, given the present state of the law, zealous officers crossed that line. *See California v. Minjares*, —— U.S. ——, 100 S.Ct. 181, 62 L.Ed.2d 117, 1979.

It follows that I would vacate the judgment of conviction and remand the cause to the district court for further proceedings, and since one of my colleagues, albeit on a different ground, concurs in this result, the case is so reversed and remanded.

EDWARDS, Circuit Judge, concurring.

Defendant-appellant appeals from a conviction and sentence in the United States District Court for the Eastern District of Michigan, Southern Division, on a charge of violating 21 U.S.C. § 841(a)(1) (1976). Defendant was found guilty by a jury of possession with intent to distribute cocaine and was sentenced to the custody of the Attorney General for a period of five years, to be followed by a three-year special parole term, as required by the statute. The case is back before this court after having been remanded for additional findings and testimony, if necessary, relative to defendant's motion to suppress evidence, namely, the cocaine found in a suitcase in the motel room he was occupying on the day of his arrest.

The total facts in this case are quite complicated and have been fully stated by my brethren. They apparently involve an excellent piece of police investigation on the part of Drug Enforcement Agents both in Pittsburgh and Detroit. The investigation unfortunately is claimed to have ended in an illegal search and seizure.

The facts which apply directly to what appear to me to be the primary issues in this appeal can be quite simply stated. DEA agents in Detroit were called from Pittsburgh, Pennsylvania during the early morning of September 20, 1977. The Pittsburgh DEA agents advised that several people with whom a man known only as "Artie" had been involved in drug trafficking had just been arrested in Pittsburgh on charges of selling narcotics. The Detroit DEA agents were also informed that an arrest warrant for "Artie" was "authorized" and would be "issued" at 9:00 a. m. the following morning. During the course of the drug transactions in Pittsburgh, one of the drug sellers had placed a telephone call to "Artie" in Room 229 of the Compton Village Motor Hotel in Livonia, Michigan, a suburb of Detroit.

At 7:00 a. m. on September 20, 1977, four DEA agents assembled at the Compton Village Motor Hotel for the purpose of arresting a man known to them only as "Artie" if they could locate him. The agents learned from the motel desk that an A. Montano, from Tampa, Florida, was registered in

Room 229 and that he was accompanied by two or three adults. The agents proceeded to Room 229, knocked on the door, which was opened with a security chain in place. One of the agents recognized the person at the door as a man he had seen in Pittsburgh apparently engaged in drug transactions there and asked him, "Are you Artie?"—or, simply, "Artie?"—receiving an affirmative answer. At that point, according to undisputed testimony, the agents forced their way into the room by pushing on the door, ripping the door chain off the loose door molding, without previously announcing their identity or purpose, as required by 18 U.S.C. § 3109 (1976).[1]

It is clear to this court that although § 3109 is phrased in terms of entry made to execute search warrants, the section has been held to apply equally to forcible entries to domiciles by federal officers made with or without a warrant. *Sabbath v. United States*, 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968); *United States v. Murrie*, 534 F.2d 695 (6th Cir. 1976). It is also clear that although the officers who broke into Room 229 in this motel may have had probable cause to believe that "Artie" had been party to a drug transaction in Pittsburgh, the grounds for their belief had not been presented to any judge or magistrate in an application for either an arrest or search warrant as required by the Fourth Amendment to the Constitution of the United States.[2]

As I see this case, the first deficiency is the lack of any warrant (search or arrest) which would serve as authority for entry into the domicile occupied by appellant. No effort was made in either Pittsburgh or Detroit to procure such a warrant, as far as this record discloses. The case must there-

fore be treated initially as simply a warrantless entry into a domicile by force. As such, the entry and search is prohibited by the Fourth Amendment of the Constitution of the United States. This court has recently spelled out the legal history of that amendment and its application to a forcible entry into a motel room. *United States v. Killebrew*, 560 F.2d 729 (6th Cir. 1977).

We recognize that this issue was not squarely raised by appellant's counsel in the District Court.[3] However the abuse of a fundamental constitutional right is subject to review in spite of such failure unless it results from a willful by-pass which is clearly not involved here. See *Kaufman v. United States*, 394 U.S. 217, 89 S.Ct. 1068, 22 L.Ed.2d 227 (1969). I believe the conviction must be vacated on Fourth Amendment grounds alone. See generally: *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886); *Wolf v. Colorado*, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949); *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685, rehearing denied 396 U.S. 869, 90 S.Ct. 36, 24 L.Ed.2d 124 (1969).

More specifically in point see *United States v. Killebrew*, 560 F.2d 729 (6th Cir. 1977); *United States v. Reed*, 572 F.2d 412 (2d Cir.), *cert. denied sub nom. Goldsmith v. United States*, 439 U.S. 913, 99 S.Ct. 283, 58 L.Ed.2d 259 (1978); *Dorman v. United States*, 140 U.S.App.D.C. 313, 435 F.2d 385 (D.C. Cir. 1970) (en banc).

Turning now to the 18 U.S.C. § 3109 issue concerning failure of the DEA agents to announce their purpose and authority before entering, we find two Supreme Court

---

1. **§ 3109. Breaking doors or windows for entry or exit**

    The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

2. The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

3. Originally appellant's motion to suppress was based upon a Michigan statute which paralleled 18 U.S.C. § 3109.

cases directly applicable to the situation with which we deal. They are *Sabbath v. United States*, 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968) and *Miller v. United States*, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958). In *Sabbath* the Supreme Court said:

> And it has been held that § 3109 applies to entries effected by the use of a passkey, which requires no more force than does the turning of a doorknob. An unannounced intrusion into a dwelling—what § 3109 basically proscribes—is no less an unannounced intrusion whether officers break down a door, force open a chain lock on a partially open door, open a locked door by use of a passkey, or, as here, open a closed but unlocked door. The protection afforded by, and the values inherent in, § 3109 must be "governed by something more than the fortuitous circumstance of an unlocked door." *Keiningham v. United States*, 109 U.S. App.D.C. 272, 276, 287 F.2d 126, 130 (1960).

*Id.* 391 U.S. at 590, 88 S.Ct. at 1759 (footnotes omitted).

In *Miller v. United States* the Supreme Court opinion said:

> Whatever the circumstances under which breaking a door to arrest for felony might be lawful, however, the breaking was unlawful where the officer failed first to state his authority and purpose for demanding admission. The requirement was pronounced in 1603 in *Semayne's Case*, 5 [Coke] Co. Rep. 91a, 11 E.R.C. 629, 77 Eng.Repr. 194 at 195: "In all cases where the King is party, the sheriff (if the doors be not open) may break the party's house, either to arrest him, or to do other execution of the K[ing]'s process, if otherwise he cannot enter. *But before he breaks it, he ought to signify the cause of his coming, and to make request to open doors . . . .*" (Emphasis supplied.)
>
> The requirement stated in *Semayne's Case* still obtains. It is reflected in 18 U.S.C. § 3109, [18 U.S.C.A. § 3109] in the statutes of a large number of States, and

in the American Law Institute's proposed Code of Criminal Procedure, § 28. It applies, as the Government here concedes, whether the arrest is to be made by virtue of a warrant, or when officers are authorized to make an arrest for a felony without a warrant. There are some state decisions holding that justification for noncompliance exists in exigent circumstances, as, for example, when the officers may in good faith believe that they or someone within are in peril of bodily harm, *Read v. Case*, 4 Conn. 166, or that the person to be arrested is fleeing or attempting to destroy evidence. *People v. Maddox*, 46 Cal.2d 301, 294 P.2d 6.

*Miller v. United States, supra*, 357 U.S. at 308–09, 78 S.Ct. at 1195–1196 (footnotes omitted).

While the government does not dispute these precedents, it does argue that exigent circumstances excused the breaking and entering without warrant or notice of authority and purpose.

We note that the District Judge did find exigent circumstances in "the suspect's prior felony conviction . . . for a violent crime, i. e. kidnapping" and the fact that this "was a motel room not a home" and the fact that "the total property damage consisted of a strip of molding being torn off the door." We do not think the last two of these findings of fact serve in any way to excuse this warrantless entry without compliance with § 3109.

Our major consideration has been the question as to whether or not the officers who approached Room 229 were in such hazard as to excuse failure to apply for a search warrant and failure to notify the occupants of their authority and purpose.

It is clear to me that DEA agents on the morning concerned had a duty to ascertain whether "Artie" was in that motel room and if so, to arrest him if they could do so legally. This could have been accomplished by staking out the premises and simultaneously seeking an arrest or search warrant. There is no proof in this record that Montano was armed or made any resistance. He would have had to close the door

in order to remove the chain. I do not reach the question of search of the suitcase since I believe the agents entry into the room was itself unlawful and unconstitutional. The admission of the cocaine seized in the room, which is the basis of this prosecution, was error which requires the vacation of the judgment of the District Court as ordered in the opinion of my Brother Peck.

I observe that prosecution of Montano for the narcotics transaction in Pittsburgh, which triggered this arrest, is not in anywise affected by this decision.

WEICK, Circuit Judge, dissenting.

In his appeal Montano raised questions relating to: (1) the DEA agents' forcible entry into his motel room;[1] (2) the existence of probable cause for his arrest without a warrant; (3) the search of his suitcase found in the motel room at the time of the arrest.

In an earlier order in this case, we remanded the cause to the District Court for findings of fact and conclusions of law, as well as the taking of any necessary additional evidence concerning whether the federal "knock and announce" statute, 18 U.S.C. § 3109, was violated by the government agents, and if so, whether that violation was excused by exigent circumstances. The remand was necessary because in the District Court at the hearing on the defendant's motion to suppress, the defendant claimed only a violation by the federal agents of the Michigan forcible entry statute, MCLA § 764.21, MSA § 28.880, which he asserted was applicable and he claimed no violation of 18 U.S.C. § 3109. Although the two statutes are worded similarly, the Michigan Court of Appeals followed the state's substantial compliance rule rather than a literal compliance with the statute enunciated by the Supreme Court and federal appellate courts.[2] *People v. Brown*, 43 Mich.App. 74, 79–90, 204 N.W.2d 41 (1974).

The facts in this case show that the defendant was extensively involved in narcotics trafficking along with one Charles Benevides. During the summer of 1977, an undercover DEA agent completed several purchases of drugs from Benevides. One such transaction was concluded at the Pittsburgh International Airport at which time Benevides pointed to a man in an adjacent car, referring to him as "his man, Arty." The undercover agent thereafter negotiated over the telephone with "Arty" for a second narcotics sale. After the actual exchange took place between the agent and Benevides, DEA agent Mateer followed Benevides to a local Holiday Inn where he was met by several men, one of whom later proved to be the defendant.

Thereafter, agent Mateer received information from the undercover agent and from an informer whose reliability and credibility have not been challenged that Benevides would soon travel to Florida with "Arty" to procure more narcotics. The informer advised Mateer that "Arty" had previously been arrested for armed robbery and kidnapping. Neither the informer nor the undercover agent knew "Arty's" full or correct name. In fact, although unknown to the agents, "Arty" had a long criminal record that included convictions on the above mentioned charges as well as for previous narcotics violations.

On September 14, 1977, the undercover DEA agent telephoned "Arty" in Detroit to arrange yet another purchase of narcotics. The exchange was completed with Benevides on the evening of September 19–20, 1977. During the course of the transaction, Benevides placed a telephone call to "Arty." This call was traced to room 229 of the Compton Village Motel in Livonia, Michigan. Thereafter, Benevides and others were arrested in Pittsburgh. These arrests

---

1. Defendant Montano was tried jointly with Eloy Augustine Garcia. Garcia was also convicted and he initially brought an appeal, No. 78–5321. Garcia's appeal was dismissed, however, when it appeared that he had fled custody.

2. *Sabbath v. United States*, 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968); *United States v. Murrie*, 534 F.2d 695 (6th Cir. 1976).

occurred at approximately 3:30 a. m. on September 20th.

Detroit DEA agents were advised of Benevides' arrest and were also informed that an arrest for "Arty" was "authorized" and would be "issued" at 9:00 a. m. the following morning. It does not appear that such a warrant was ever actually procured.

At approximately 7:00 a. m. on September 20th, four DEA agents assembled at the Compton Village Motel for the purpose of arresting the man then known to them only as "Arty." The agents learned from the motel desk clerk that an "A. Montano" from Tampa, Florida was registered in room 229. The clerk reported that Montano was accompanied by two or three adults. The motel registration showed that he was driving a car with Florida license plates, and such a vehicle had been observed in the parking lot.

Armed with this information, the agents proceeded to room 229 and knocked on the door. An individual dressed only in boxer shorts (and perhaps a T-shirt) opened the door partially, as it was held by a door chain. At this point the door was open about eight inches and the agents could see that the chain on the door was not securely fastened because the door molding to which the chain was attached was decrepit and was "flopping." Agent Mateer immediately recognized the man at the door as one of the individuals he had earlier seen with Benevides at the Holiday Inn. The motel room was dark and small and the agents could not see the interior clearly.

At this point, agent Mateer did not identify himself or his purpose, but instead he attempted to verify the identity of the man standing across the threshold from him. Agent Mateer asked either "are you Arty?" or simply "Arty?" The man responded affirmatively. At that point, according to the testimony credited by the District Court, the agents forced their way into the room by pushing on the door and thus ripping the

door chain off the molding. The District Court found as a fact that the agents announced their identity and purpose "simultaneously" with their entry.

When the agents entered, they found that in addition to Arty the room was occupied by his wife, their small child, and another adult male. The room contained two beds. After "Arty" (the defendant herein) was informed that he was under arrest, the other adults were ordered out of bed and the agents began a search of the room. They opened an unlocked suitcase which was in plain view protruding out from under one of the beds near the defendant and the other man in the room. The agents found money and a quantity of cocaine inside the suitcase. The cocaine taken from the suitcase formed the basis for the present prosecution.

The agents testified at the suppression hearing that the suitcase was opened at least in part because the defendant had requested them to do so in order to remove certain items of clothing for him. The District Court refused to believe all of this testimony, and held that the search could only be justified as incident to the arrest.

After narcotics were found, the agents briefly discussed among themselves whether the other two adults should be arrested. Hearing this, the defendant voluntarily interjected before any questioning of him that the "stuff" was his and that the others "didn't know anything about it." The agents then decided not to arrest the other adults and left with the defendant and his suitcase in their custody.

### The Forcible Entry

The defendant has claimed that the agents' entry into the motel room violated 18 U.S.C. § 3109[3] and that the violation was not excused by exigent circumstances. Viewing the evidence seized upon the search of the suitcase as a product of the forcible entry, the defendant contends that

---

**3.** 18 U.S.C. § 3109 provides:

The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a

search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

such evidence should have been suppressed. Although section 3109 was violated in this case, I believe that the evidence need not be suppressed because the agents' conduct was justified by the presence of exigent circumstances.

Although section 3109 is phrased in terms of entries made to execute search warrants, the section has been held to apply equally to entries made by federal officers to effectuate an arrest with or without a warrant. *Sabbath v. United States*, 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968); *United States v. Murrie*, 534 F.2d 695 (6th Cir. 1976); *accord, United States v. Raines*, 536 F.2d 796, 798–99 n.2 (8th Cir.), *cert. denied*, 429 U.S. 925, 97 S.Ct. 327, 50 L.Ed.2d 293 (1976); *United States v. Allende*, 486 F.2d 1351, 1353 (9th Cir. 1973), *cert. denied sub nom Montoya v. United States*, 416 U.S. 958, 94 S.Ct. 1973, 40 L.Ed.2d 308 (1974); *United States v. Sheard*, 154 U.S.App.D.C. 9, 12, 473 F.2d 139, 142 (D.C. Cir. 1972), *cert. denied*, 412 U.S. 943, 93 S.Ct. 2784, 37 L.Ed.2d 404 (1973); *United States v. Davis*, 461 F.2d 1026, 1034 & nn.10, 11 (3d Cir. 1972); *United States v. Bradley*, 455 F.2d 1181, 1185 & n.8 (1st Cir. 1972), *affirmed*, 410 U.S. 605, 93 S.Ct. 1151, 35 L.Ed.2d 528 (1973); *United States v. Manning*, 448 F.2d 992, 1000 n.5 (2d Cir.) (en banc), *cert. denied*, 404 U.S. 995, 92 S.Ct. 541, 30 L.Ed.2d 548 (1971); *see United States v. Syler*, 430 F.2d 68 (7th Cir. 1970).

Although worded in terms of a "breaking," the Supreme Court has explained that virtually any unannounced entry through a closed door is within the scope of section 3109. The court in *Sabbath* stated:

> An unannounced intrusion into a dwelling—what § 3109 basically proscribes—is no less an unannounced intrusion whether officers break down a door, *force open a chain lock on a partially open door*, open a locked door by use of a passkey, or, as here, open a closed but unlocked door. The protection afforded by, and the values inherent in, § 3109 must be "governed by something more than the fortuitous

circumstances of an unlocked door." *Keiningham v. United States*, 109 U.S. App.D.C. 272, 276, 287 F.2d 126, 130 (1960). [391 U.S. at 590, 88 S.Ct. at 1758–1759 (footnote omitted) (emphasis added).]

Thus in this case the entry is within the scope of section 3109 notwithstanding the "decrepit" condition of the door chain that was broken to gain admittance. Accordingly, in order to avoid the application of the exclusionary rule to the fruits of the forcible entry, the evidence must show either compliance with section 3109 or exigencies sufficient to excuse noncompliance. *United States v. Murrie, supra; see Sabbath v. United States, supra*, 391 U.S. at 591, n.8, 88 S.Ct. 1755.

Under section 3109, there are three conditions which must be met before a forcible entry is permitted: "1) announcement of authority, 2) announcement of purpose, and 3) grounds for believing entry has been refused." *United States v. Murrie, supra*, 534 F.2d at 698. And in *Miller v. United States*, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958), the court explained that it is not enough simply for the officers to identify themselves, they must also make their purpose known to the occupants of the room sought to be entered. *Id.* at 312–13, 78 S.Ct. 1190.

In this case, the District Court found that the agents' announcement of authority and purpose was "simultaneous" with entry. From the testimony of agent Mateer, which was quoted by the court, and which was specifically credited in areas where it conflicted with other testimony, it was clear that no announcement at all was made until after the door chain had been broken. Moreover, his testimony also shows that there was no announcement of *purpose* until after at least two of the four agents had entered the motel room. The conclusion is therefore inescapable that section 3109 was violated by the forcible entry in this case.[4] *See Miller v. United States, supra.*

---

4. In our earlier order in this case the District Court was required to determine "(1) whether

the provisions of 18 U.S.C. § 3109 have been complied with, and (2) whether any exigent

In considering the presence of exigent circumstances, the District Court correctly observed that the situation must be evaluated at the moment that the agents broke the door chain and forced their way into the motel room. The exigency of the circumstances at that moment must then be measured by considering the conduct sought to be excused.

At the moment the agents made their forced entry, they knew they were standing across the threshold from the man they intended to arrest. The door was open about eight inches and the agents could see that the chain was not securely fastened to the molding. "Arty" was known to be involved in the narcotics trade at a level where the use of weapons is common. He was believed to have been involved in armed robbery and kidnapping in the past so that he could be considered capable of violence. Indeed, as noted above, the defendant has a long history of arrests and convictions for crimes involving violence and narcotics, so that he might well have been a good deal more dangerous than the agents even believed. Further, the agents had been told that "Arty" was accompanied by perhaps two other adults. In addition, the motel room was small and its interior was dark so that the agents could not see the inside very clearly. Finally the District Court found that the agents forced the door open just as the defendant was moving to close it.

Although it would have taken only a few additional seconds for the agents to comply with section 3109, I believe that they were justified in preventing the defendant from closing the door, even for a brief moment, because of the real danger from the agents' viewpoint that someone in the room might procure a weapon.[5] Thus I believe that the District Court was correct in concluding that the circumstances were sufficiently exigent to justify their agents' action, and his findings of fact are not clearly erroneous.[6]

circumstances existed which may excuse compliance." Notwithstanding this command, the District Court in its own words "considered the question of forced entry in tandem with the question of exigent circumstances," relying on an opinion of the Ninth Circuit in *United States v. Bustamante-Gamez*, 488 F.2d 4 (9th Cir. 1973), *cert. denied*, 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1974). The District Court then concluded that there was no violation of section 3109, but did so apparently because the court found the circumstances sufficiently exigent to justify the entry. As we stated in our order of remand, and as this court explained in *Murrie* and the Supreme Court explained in *Sabbath*, the question of compliance with section 3109 is wholly separate from the question of the presence of exigent circumstances to justify noncompliance.

5. Statistics for a recent period showed that 95% of the assaults on DEA agents occurred during arrest situations. *Assaults on DEA Agents July 1975—December 1976*, U.S. Dept. of Justice (1977). In these circumstances we believe that the potential for harm to the arresting officers ought not to be minimized.

6. The defendant has made a rather oblique reference in his brief which may be construed as a contention that the warrantless aspect of the agents' entry also rendered it illegal. In fact, it is the law in this and other circuits that the government must show exigent circumstances to justify a warrantless entry for the purpose of making an arrest. *United States v. Scott*, 578 F.2d 1186, 1189–90 (6th Cir.), *cert. denied*, 439 U.S. 870, 99 S.Ct. 201, 58 L.Ed.2d 182 (1978); *United States v. Killebrew*, 560 F.2d 729 (6th Cir. 1977); *United States v. Shye*, 492 F.2d 886 (6th Cir. 1974) (per curiam); *accord, United States v. Reed*, 572 F.2d 412, 417–24 (2d Cir.), *cert. denied sub nom. Goldsmith v. United States*, 439 U.S. 913, 99 S.Ct. 283, 58 L.Ed.2d 259 (1978); *United States v. Calhoun*, 542 F.2d 1094 (9th Cir. 1976), *cert. denied*, 429 U.S. 1064, 97 S.Ct. 792, 50 L.Ed.2d 781 (1977); *Dorman v. United States*, 140 U.S.App.D.C. 313, 435, F.2d 385 (D.C.Cir.) (en banc); *see Coolidge v. New Hampshire*, 403 U.S. 443, 480–81, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). In an apparent response to this reference, the government in its main brief has urged that the circumstances excused the absence of a warrant. I agree.

Although it is conceivable that the agents could have attempted to obtain a warrant prior to the arrest, this fact alone is not fatal. *See Cardwell v. Lewis*, 417 U.S. 583, 595–96, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974) (Blackmun, J.). I believe that the agents' limited identification of the man known as "Arty" coupled with the likelihood of his flight once he found out about Benevides' arrest, and also coupled with the reasonable belief that "Arty" was capable of violence combined to create a need for prompt action and justified the warrantless early morning entry. We note that the agents discovered "Arty's" likely location at around 3:30 a. m. Additional confirming information was obtained at around 7:00 a. m. the same morning, immediately before the arrest occurred.

## The Arrest

The defendant contends that the agents lacked probable cause when they effected his arrest. This argument is plainly without merit. We note at the outset that probable cause can be established from the collective knowledge of the arresting officers. *United States v. McManus*, 560 F.2d 747 (6th Cir. 1977), *cert. denied*, 434 U.S. 1047, 98 S.Ct. 894, 54 L.Ed.2d 798 (1978).

In this case the agents in Detroit were aware of the work of the undercover agent which established that a man known as "Arty" was deeply involved in narcotics trafficking with Benevides, and that "Arty" had travelled to Florida to procure narcotics. An informer whose reliability and credibility have not been challenged also corroborated this fact. The agents were also aware of the telephone call from Benevides to "Arty" which was traced to the motel room occupied by the defendant. Finally, when the agents arrived at the motel, the desk clerk confirmed that a man from Florida with the first initial "A" was registered in room 229 and that he was driving a car with Florida license plates. Such a car had been observed in the motel parking lot.

This information alone was sufficient to justify the belief that the man known to the agents only as "Arty" was dealing in narcotics and was located in room 229 of the Compton Village Motel.

In addition, when the defendant answered the knock on his door that morning, agent Mateer recognized him as a man he had seen previously in the company of Benevides; and that the defendant confirmed his own identity when he acknowledged that he was "Arty". The sum of all of this information was plainly sufficient to establish probable cause for the defendant's arrest. *See Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).

## The Search of the Suitcase

As noted above, the agents testified at the suppression hearing that the suitcase containing money and contraband was only opened and searched after the defendant asked agent Mateer to remove come clothes from it so that he could get dressed. Although the District Court specifically credited the remainder of agent Mateer's testimony, it refused to believe that the search was consensual and upheld it only on the ground that it was lawful as incident to the arrest of the defendant, which had occurred moments before. In this court the government has not renewed its claim that the search was pursuant to Montano's consent.

The defendant's primary argument with respect to the search is that the suitcase was not within his "immediate control" under *Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), because it was closed and was protruding in plain view out from under one of the beds. The defendant also argues that under *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), the agents should have merely seized the suitcase, removed it from the room, and then attempted to obtain a search warrant. *See Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979).

The court in *Chimel* explained the rule regarding searches incident to a valid arrest as follows:

> [I]t is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the

arrestee's person and the area "within his immediate control"—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence. [395 U.S. at 763, 89 S.Ct. at 2040.]

In *United states v. Chadwick, supra,* the court held that with respect to containers such as luggage that are seized at the time of the arrest, the constitution requires the following line to be drawn:

[W]hen no exigency is shown to support the need for an immediate search, the Warrant Clause places the line at the point where the property to be searched comes under the exclusive dominion of police authority. [433 U.S. at 15, 97 S.Ct. at 2486.]

*See Arkansas v. Sanders, supra; United States v. Calandrella,* 605 F.2d 236 (6th Cir. 1979). The court in *Chadwick* explained that this rule is required in order to protect the arrested person's privacy interest in the contents of his luggage, which unlike the arrestee's privacy interest in his person, is not eliminated simply by virtue of his arrest. 433 U.S. at 16 n. 10, 97 S.Ct. 2476; see *Arkansas v. Sanders, supra,* 442 U.S. at 766, 99 S.Ct. 2594 (concurring opinion).

In the present case, I am satisfied that the suitcase was within the "immediate control" of the defendant at the time of his arrest. The suitcase was unlocked and was protruding out from under one of the beds near the defendant. It was thus within the area from which he might have secured either a weapon or destructible evidence. Accordingly, *at minimum,* the officers were entitled to seize the suitcase in order to prevent the defendant's access to it. *See Chimel v. California, supra; cf. United States v. Giacalone,* 588 F.2d 1158, 1160–61 (6th Cir. 1978).

The only remaining question is whether the circumstances were sufficiently exigent to excuse the agents' failure to obtain a warrant prior to the search. I hold that they were. Again it must be emphasized that the agents justifiably feared a potentially dangerous situation as they entered the motel room. They had reason to believe that the defendant was capable of violence. And they had been told that he was accompanied by at least two other adults, which proved to be true. It was reasonable for the agents to act quickly to secure the premises and eliminate any opportunity for either escape or for the use of weapons. Although the agents outnumbered the adult occupants four to three, I reject the defendant's contention that the agents should have dispatched one of their number to take the suitcase and leave the room. Although this procedure may be required in most other less dangerous situations, *see United States v. Chadwick, supra,* we decline to impose it here where the situation faced by the agents required quick decisive action. To do so would likely have increased the risk of harm to the federal officers. *See Warden v. Hayden,* 387 U.S. 294, 298–99, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967).

In addition, although somewhat less likely, it was possible that one of the two adults left behind could have claimed the suitcase before the agents had the opportunity to present the facts to a magistrate. *But cf. United States v. Giacalone, supra,* 588 F.2d at 1160–61.

Thus, I hold that the search of the suitcase at the time and place of the defendant's arrest was justified by exigent circumstances and was not barred by *United States v. Chadwick, supra.*

In my opinion, the factual findings of the district judge with respect to the exigent circumstances are supported by substantial evidence and are not clearly erroneous.

I would affirm the judgment of the District Court.