NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 04a0118n.06
Filed: November 22, 2004

No. 03-4069

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **ON APPEAL** FROM THE |
| **Plaintiff-Appellee,** | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| v. | ) | NORTHERN DISTRICT OF |
| | ) | OHIO |
| ARTHUR HENDRICKS, | ) | |
| | ) | **O P I N I O N** |
| **Defendant-Appellant.** | ) | |

BEFORE:  NORRIS, BATCHELDER, and ROGERS, Circuit Judges.

**ALAN E. NORRIS, Circuit Judge.**  Defendant Arthur Hendricks appeals from his jury conviction for being a felon in possession of a firearm, 18 U.S.C. § 922(g)(1).  He raises three issues on appeal: 1) the district court erred in denying his motion to suppress evidence of a statement that he gave to police; 2) the jury conviction was not supported by constitutionally sufficient evidence; and 3) prosecutorial misconduct denied him a fair trial.

**I.**

During defendant's trial, security officer James Mayfield testified that he worked at Huron Hospital in East Cleveland during the early morning hours of September 8, 2002.  The hospital had 32 different video monitors of the building and its surroundings.  According to Mayfield, one camera panned along nearby Belmore Street.  He observed two men who were helping a third to walk.  One of the two men lending assistance stopped and approached a fourth man on a bicycle.  The man on

the bicycle "jumped off" and "threw his hands up." At that point, Mayfield gave the following

testimony:

> [T]he male that was on the bike put the bike down and got off of it. And the male that went up to him picked the bike up and threw it at him and then he pulled out what appeared to be a gun. And he pointed it at him. And the male backed up and he yelled at him, and put the gun back in his waistband and he went back and picked up the male that he had put on the ground. And then they went up the sidewalk to an apartment building.

At this point, Mayfield called East Cleveland police officer Scott Vargo, who was the detail officer

at the hospital that night, to report what he had seen. Vargo appeared and watched the two men

carry the third into an apartment building that was just behind the hospital. Vargo called the police

station before pursuing the men. Mayfield stayed behind and watched as officers followed the three

into the apartment building.

Officer Vargo testified that Mayfield called him from the emergency room on the night in

question because "he could see a man on the video monitor with a pistol in his right hand." After

summoning assistance, Vargo and three other officers entered the apartment building. According

to Vargo, one of the apartment doors was open. The officers knocked and the tenant, Lois Jester,

came to the door. In response to questions, she allowed the officers into the apartment where they

encountered three men in the dining area. Vargo testified, "I immediately recognized the male that

[Security] Officer Mayfield pointed to on the monitor saying, you know, that that was the male with

the gun." After checking the three men for weapons, the officers asked Ms. Jester if she had a

weapon. She indicated that she did not and invited the officers to search. Vargo found a revolver

in the bottom of a dresser in the hallway. He then testified:

- 2 -

> Lois was following me while, you know, I was checking, and I turned to her and asked her if this was her firearm. She stated no, and that it shouldn't be in here.
>
> I began to walk back out into the dining room area where the other officers were, and stated, you know, I found the gun. You know, here is the gun.
>
> At that time Arthur Hendricks looked up at Officers Bolton and Gardner and states, "that's my gun. I wasn't going to shoot that guy, I just wanted him to get away from me."

Vargo then stated that the gun was loaded and identified it in court as a Smith & Wesson .38 revolver.

Officers Kenneth Bolton and Scott Gardner also testified that they were present when defendant admitted that the gun found by Vargo belonged to him.

Lois Jester testified that she was in the process of getting some milk for Kareem, one of the three men, because the men were intoxicated when the officers arrived. She recalled that the officers might have knocked and told her that they were looking for an injured man escorted by two others, one of whom had a weapon. According to Jester, defendant admitted the gun was his as soon as it was found.

The only other witness for the government was ATF agent Nicholas Vouvalis who testified that the firearm in question traveled in interstate commerce.

Defendant called no witnesses and the jury returned a verdict of guilty to the sole count of the indictment. The district court sentenced defendant to 110 months of incarceration, three years of supervised release, and imposed an assessment of $100.

**II.**

*1. Motion to Suppress*

### a. Proceedings Below

Defense counsel filed a motion to suppress his client's statement regarding ownership of the firearm based upon the officers' failure to apprise him of his *Miranda* rights. The district court held a suppression hearing and issued an order denying the motion, reasoning that the statement was voluntary:

> Officer Vasco [sic] did not interrogate Hendricks when he told the other police officers that he had found the gun. The statement that he had found the gun was not reasonably likely to elicit an incriminating response. As a volunteered statement, Officer Vasco [sic] was not required to give *Miranda* warnings to Hendricks.

Order, March 19, 2003 at 4-5. This order was filed after the trial of defendant. The suppression hearing was conducted on the morning before the trial began and the court made the following ruling in open court, which was subsequently memorialized in the order:

> I find that the police officers entered the apartment with consent. That the defendant himself had no ownership interest of the apartment, and that for that reason he has no standing to object to the entry into the apartment.
>
> I find, as they entered, the police officers made a generalized statement to all the four participants about, where is the gun? Subsequent to that, and with the consent of the owner of the apartment, the police officer conducted a search of the apartment. I find that this was separated by a relatively significant period of time before the later statement of the defendant.
>
> The court finds, after conducting the search and after simply indicating [sic] a statement not directed at the defendant, but instead a statement made to the other police officers, that the defendant volunteered that the firearm was his, and that it was not intended to be used to shoot somebody.
>
> But I find that there was no interrogation of the defendant at the time he made the statement, and for that reason *Miranda* does not apply.

### b. Standard of Review

"When reviewing the denial of a motion to suppress, we review the district court's findings of fact for clear error and its conclusions of law *de novo*." *United States v. Hurst*, 228 F.3d 751, 756 (6th Cir. 2000) (citing *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999)).

*c. Analysis*

Defendant argues that his statement violated *Miranda v. Arizona*, 384 U.S. 436 (1966), because he was in custody and was interrogated. Statements made by a defendant in response to interrogation while in police custody are not admissible unless the defendant has first been told of the constitutional right against self-incrimination and has validly waived this right. *Id.* at 478-79.

In support of his position, defendant points to the fact that Officer Vargo testified at the suppression hearing that the three men were searched and asked to sit on the floor. He then asked them where the firearm was. When there was no answer, Vargo searched the apartment and found the weapon. He went on to testify, "As I'm coming from the kitchen I told Officer Gardner and Officer Bolton I found the gun. And I could see [defendant] look up at them and tell them, 'that's my gun.'"

The district court credited the testimony of the police officers when it concluded that defendant made his statement voluntarily, which is a factual finding subject to clear error review. Although not cited by the parties, *United States v. Crowder*, 62 F.3d 782 (6th Cir. 1995), is helpful to our resolution of this issue. In that case, defendant was also charged as being a felon in possession of a firearm. He was interrogated about the whereabouts of the gun without being advised of his *Miranda* rights, put in handcuffs, and placed in the squad car. However, he "pecked" at the squad car window to attract the attention of the Chief of Police and told him where the gun

was located. *Id.* at 785. This court affirmed the decision of the district court to deny defendant's

motion to suppress this statement:

> While the defendant was in custody upon his arrest, *Miranda* warnings were required only when the defendant was in custody *and* was subject to interrogation, which is defined as "express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300-01, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980) ("[T]he special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation."); *United States v. Montano*, 613 F.2d 147, 149 (6th Cir. 1980). In this case, the defendant's initiation of contact with Chief Cannon and offer to tell him the location of the gun were not the result of either express questioning or its functional equivalent.

*Id.* at 785-86. Similarly, in the case before us, defendant was in custody to the extent that he was

not free to leave. However, he volunteered the statement about the gun and, therefore, it remains

admissible. *Miranda*, 384 U.S. at 478 ("[v]olunteered statements of any kind are not barred by the

Fifth Amendment and their admissibility is not affected"); *see also United States v. Cole*, 315 F.3d

633, 636 (6th Cir. 2003) (later voluntary statement was admissible even when earlier statements

must be suppressed).

## 2. *Sufficiency of the Evidence*

Defendant contends that the evidence introduced at trial was insufficient to support his

conviction beyond a reasonable doubt. The standard of review for a challenge to the sufficiency of

the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution,

*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable

doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). When considering the evidence, we must

allow the government the benefit of all reasonable inferences and must "refrain from independently

judging the credibility of witnesses or weight of the evidence." *United States v. Welch*, 97 F.3d 142, 148 (6th Cir. 1996) (citations omitted). Furthermore, in this case, defense counsel failed to make a motion for acquittal as provided in Fed. R. Crim. P. 29. "Failure to make this motion 'constitutes a waiver of any objection to the sufficiency of the evidence' with the result that this court 'will not reverse absent a miscarriage of justice.'" *United States v. Gooding*, 351 F.3d 738, 741 (6th Cir. 2003) (quoting *United States v. Nesbitt*, 90 F.3d 164, 167 (6th Cir. 1996)).

Despite the onerous standard of review, defendant urges us to discount the testimony provided by Ms. Jester. Her testimony was that the three men were all drunk. Implied in her testimony is that she was on fairly intimate terms with Eric, one of the three, who was in the habit of taking his shirt off in her apartment when drunk. Defendant speculates that her relationship with Eric gave her a reason to protect him. As a result, she fingered defendant for owning the gun and stated that drugs found in her freezer belonged to the third man, Kareem. How, defendant asks, did he have time to leave the dining room and hide the gun when it was only Eric that Ms. Jester recalls pacing around "trying to get Kareem stable"?

Given the standard of review, we have no choice but to reject defendant's position. A rational juror could have credited Ms. Jester's testimony, which was corroborated by three police officers, all of whom heard defendant state that the gun belonged to him. Even without her testimony, the testimony of the three police officers is sufficient to sustain the conviction.

### 3. Prosecutorial Misconduct

Finally, defendant contends that the government committed prosecutorial misconduct during opening statement when the Assistant United States Attorney ("AUSA") made the following comments about the upcoming testimony:

> So Scott Vargo comes into the room. He views the camera. Actually, they have the ability, they will tell you to zoom in on the action, to move the camera. What eventually happens is this man that they saw with a gun and another man are carrying or helping a third person down the street, and then they turned and they go into an apartment building. All this they see on camera.

> So when Scott Vargo sees what's going on, or is told what's going on by Mayfield, he calls the East Cleveland Police Department. He says, we have a guy with a gun out here. There is some small altercation. Send some police officers.

Defendant focuses on the fact that the AUSA stated that "they" saw a gun, even though Vargo later testified that Mayfield pointed to the person whom he had seen draw the gun. In the very next paragraph, however, the AUSA clarifies that Vargo is "told" what is going on by Mayfield.

This court recently summarized the manner in which prosecutorial misconduct claims should be analyzed:

> We review allegations of prosecutorial misconduct under a two-step process. First we decide if the statement was improper; if the answer to that question is yes, we must consider whether the statement was "flagrant." *United States v. Francis*, 170 F.3d 546, 549 (6th Cir. 1999). To determine if the statements here reaches that level, effectively rendering [defendant's] trial fundamentally unfair, this court considers the following factors: 1) whether the remarks tended to mislead the jury or to prejudice the accused; 2) whether the remarks were isolated or extensive; 3) whether the remarks were deliberately or accidentally placed before the jury; and 4) the overall strength of the evidence against the accused. *United States v. Green*, 305 F.3d 422, 429-30 (6th Cir. 2002); *Francis*, 170 F.3d at 549-50 (citing *United States v. Monus*, 128 F.3d 376, 394 (6th Cir. 1997)). In examining prosecutorial misconduct, it is necessary to view the conduct at issue within the context of the trial as a whole. *See United States v. Young*, 470 U.S. 1, 12, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) (holding that it is critical to examine the statements at issue within the context of the entire record); *Francis*, 170 F.3d at 552 (noting that the determination of whether a

> prosecutor's behavior constitutes prejudicial error must be made in the context of the whole trial).

*United States v. Beverly*, 369 F.3d 516, 543 (6th Cir. 2004), *cert. denied,* October 4, 2004 (No. 04-5890).  Because defense counsel failed to object to the statement, however, we review for plain error.  *United States v. Modena*, 302 F.3d 626, 634 (6th Cir. 2002), *cert. denied*, 537 U.S. 1145 (2003).

Any misstatement made in the opening argument was inadvertent and isolated.  At certain points in her opening statement, the AUSA indicated that Officer Vargo did not himself see defendant with the gun.  She commented, for instance, "Vargo will tell you that he's convinced there is a gun [in the apartment], because Mayfield saw him put the gun in his waistband."  In short, the statements, while regrettable, do not rise to the level of the "flagrant" and did not so mislead the jury that defendant was deprived of a fair trial.

### III.

The judgment of the district court is **affirmed**.